’In this case, the several members of the Court delivered Opinions seriatim.
Chief Justce Robertson:
— In 1829, a fieri facias, wiiich bad been issued on a judgment in favor of Sleeper and Aisop against Henry G. Doyle, on a note given in 1818, having been returned “ no property,” they filed a bill in chancery against him and his two infant children, (William Tod Doyle and Mary Elizabeth Ann Doyle) alleging that the father, being indebted to insolvency, bought with his own money, two fractions of lots in the town of Maysville, in this state, and with the design of defrauding his creditors, procured "conveyances from the vendor (Lucas) to his said children nominally, but in truth, for his own use and benefit ; and they therefore prayed for a decree for subjecting.the lots to the satisfaction of their judgment.
H. G. Doyle’s answer denied the charge of fraud, and averred that the money which had been paid for the lots, was the property of the children to whom the title had been conveyed.
The answer of the children, by a guardian ad litem, required proof of the material allegations of the bill, and reiterated the averment that it was their money, and not that of their father, which he had paid for the lots.
One of the deeds was made in 1825; the other in 1827.
Only two depositions were read on the hearing of the cause in the circuit court. One of them proved that H G. Doyle paid for the lots, made the contracts for them, and required the vendor to convey the title to his (Doyle’s) children, alleging that he had bought the lots for them. The other witness proved that, about *532 the date of the contract for one of the lots, H.. G, Doyle was in good practice as a physician in Maysville, was pressing collections,” and told the witness that lie was endeavoring to raise money to pay tor the lots.
An insolvent father having purchased land, and taken the title •to his children —his ans . erin a suit to subject it to his debt, or his declarations after the conveyance, may not be evidence against them:— liis indebtedness at the time, and payment with his money, are evidence against them. That they (infants, ) had money to make such purchase, , will not be presumed,in the absence of proof.
If a father holds the title to real estate, and being much, in-debit'd,conveys it to his child, the conveyance will he ( Of, the statute) fraudulent and void as to act his créditos. It he is not indebted at the time of theconveyance, it may bo good against subsequent creditors.
*532 The witness also swore, that H. G. Doyle, after-wards, told him that he had the title conveyed to his children, to save the property from a heavy debt which had been devolved on him by the fraud of a partner in trade.
The circuit court having decreed that the lots should be subjected to the satisfaction of the judgment, this writ of error is prosecuted by H. G. Doyle' and his two children to reverse the decree.
As against H. G. Doyle, his insolvency at the dates of the deeds, and the fraudulency of his motive in procuring the titles to his children, are satifactorily. established. But, though the children may be deemed volunteers, it may, perhaps, be admitted, that neither their father’s answer, nor his declarations to the wit-■ ness after the dates of the deeds, should operate essentially to their prejudice. ■ However that may be, two important facts are sufficiently established against the children, without the declarations or the answer of the father: first, his indebtedness at the dates of the conveyances to them: second, the payment of his own money. for the lots.
The first is proved by the'judgment of the defendants; and the second must be inferred from the facts which appear. This court cannot, in the absence of .any evidence 10 that-effect, presume that the infants had money of their own; and, if they had, the fact was susceptible of proof, and would probably have been proved. As there is no siich proof, the rational inference from the fact that 11 G Doyle paid for-the lots, would be, that the money was his own. Moreover, a fact proved by one of the depositions (ends strongly to the same conclusion, and" fortifies the legal presumption. The money must, therefore, he deemed to have been H. G. Boyle’s.
Had II. G. Doyle held (he legal title to the lots, and conveyed it lo his children for no other consideration than that of blood, his indebtedness at the time, would, *533 according to the established interpretation of the statute against fraudulent conveyances, have rendered the conveyances fraudulent, per se, for the Jienefit of all his bona fide creditors — subsequent as wéll as precedent.
The purchase, by a debtor, with his, money, of property which is conveyed to a third party, is not v. ithin the statute against fraudulent conveyances. See the concurrent opinion of Judge Nicholas, post
Conveyances fraud of prior creditors arevoid at common law. But the common la¡. does not apply this rule to subsequent creditors
The consideration of blood may be sufficient, as against subsequent creditors, unless the conveyor was indebted at the date of the conveyance. But such indebtedness, to a material extent, would invalidate the deed as to all creditors. Such is the doctrine of legal or constructive fraud, established by a long series of adjudications, upon the statute of 13th Elizabeth, which has been substantially incorporated’ into a fatuto of this state ; and the same interpretation of the latter statute has been adopted by this court.
'But the judges of England, with all their zeal for extending, by a construction peculiarly latitudinary, the operation of the statute of 13th Elizabeth, never applied it to a case like this, in which the conveyance was made, not by the debtor, or oj his estate, but by another person, at his instance, and in consideration of his money. The statute was never applied to purchases by a debtor; but has been construed to operate only on conveyances by him— Procter vs. Warren, Sel. Ca. in Lord King's time ; Lamplugh vs. Lamplugh, 1 Pr. Wms. 111; Crozier vs. Young, 3 Mon. 157.
It is therefore evident, that the decree which was rendered in this case, is unsupported by statutory authority-, and consequently, it cannot be sustained unless it be authorized by (he principles of the common Jaw.
The common law abhors fraud of every kind and in every- shape ; and hence, even in its infancy, it adopted the maxim, that “ fraud vitiates every thing.'’’
But the charity’ of the common law will never presume fraud ; it always requires some'proof of a fraudulent intent; unlike the judicial system built on the statute, it knows actual fraud only ; it does not recognise such an abstraction as merely legal or constructive fraud. It differs, in another particular, from the artificial system engrafted on the statute — it vacates conveyances only for the benefit of prior creditors. In this respect, at least, it may bo applicable to this case, because tire de *534 fendants were creditors at and before the dates of tlie conveyances. Whether it he properly applicable in any other reaped, remains to lie considered.
A parent may .provide for the support and education of his children, notwithstanding his indebtedness. — See the concurrent view, and further consideration of thesub ject, by Judge U .-¿post.
The dioses in action - of a debtor” cannot, .but by force of the statute, be made liable to his debts by bill in chancery; nor can such things as are not bound by the judg’t or ex’on, be pursued into the hands of those to whom the debtor may have transferred them —Money is not a chose in action, nor «'¡than the lien of an ex’on ; yet it may be levied on while in the possession of the debtor. Judge N. concurs. See also a different view by Judge U. post.
The common law looks with an indulgent eye on the parental sympathies, (Plow. Com. 307,) and therefore it will permit an indebted father to appropriate his mow* ey to the education and comfortable maintenance of his children, in defiance of the claims of his creditors, provided his motives be pure, the provision suitable, and the mode of securing it appropriate and eligible. It will not presume a false or fraudulent motive for a prudent and allowable provision for those who have paramount claims to protection and sustenance from parental bounty.
It is not forgotten that Lord Northington, in the ease of Partridge vs. Gopp, (Ambler, 596,) held the donees of money liable for the prior debts of the donor. But it would be difficult to reconcile that decision with either principle, analogy, or authority. The only reason suggested by Worthington is, that “he thought that no man has such a power over his property as that he can dispose of it só as to defeat his creditors, unless for consideration.” In the abstract, this reasoning is as legal as it is ethical — being no more than the sound maxim, that “a man must he just before he is generous.” No man should have such, power, over such of his property as may be subjected by process of law to the payment of his debts, ■as to be able to deieat the executions of his honest creditors, by donations to his friends or his kindred. But it would be difficult to discover the principle, or approve the reasoning, upon which it could be maintained, that a creditor may, by the process of the law, reach, in the hands of a debtor’s child, or donee, that which he could not, by any legal .means, have taken from the debtor himself whilst it was in his possession.
In Bayard vs. Hoffman, 4 Johnson' s Chan. Reps. 450, Chancellor Kent seemed to have been inclined to the opinion, that a creditor might, according to the common law, have been entitled to the aid of a chancellor to subject a chose in action to the satisfaction of a judgment; and that a donee oí such an interest might have been sub *535 jected to liability for its value. But the weight of authority is opposed to that dictum of the distinguished American jurist ; and the doctrine to which it inclines, though supported by Taylor vs. Jones, 2 Atk. 600, has been overruled in England, and has never been deemed to be sound law in this state since he case of Buford vs. Buford, 1 Bibb, 305. In Dundas vs. Dutens, Lord Thurlow said, “ is there any case where a man, having stock in his own name, has been sued for the purpose of having it applied to satisfy creditors ? Those things— such as stock, debts & being dioses in action, are not liable ; they could not be taken on a levari facias. ” Lord Elden has frequently said that chancery cannot subject stock, eo nomine, because there is no lien on it, and because, also, the chancellor will not aid the infirmity of the. law by taking hold of that which the law exempts from execution. And the last post-revolutionary case cited in Bayard vs. Huffman, supra, accords with the prevalent doctrine. In that case, Lord Chancellor Summers said, that “ he had listened very attentively to Lord Thurlow, and he was clearly of opinion that dioses in action could not be reached by the process of a court of chancery.” The legislature of this state virtually re-cognised that as the true doctrine of the common law, when, in 1821, it passed an act authorizing a court of equity to subject dioses in action and equitable rights to the satisfaction of judgments; and Roberts, in his treatise on Fraudulent Conveyances, lays down the same doctrine, in page 422.
Money is not properly a chose in action, and it may be levied on to satisfy a judgment, if the officer can, without violence, get hold of it. But an execution does not operate as a lien on money, according to the common law ; and as money is the common circulating medium, cannot be identified, arid loses its individuality by use and circulation, a creditor cannot pursue it in the hands of a stranger. Roberts on Fraud. Con. 424, 2d Am. Ed. ; Handy vs. Dobbin, 12 Johnson, 220; 1 Cranch, 133. The case of Crazier vs. Young, supra, authorizes the inference that this court recognized the same doctrine. The case of Halbert &c. vs. Grant, 4 Monroe, 580, intimates the same doctrine. *536 In that case, it is true, the sons of a'fraudulent alienor were subjected personally to the value of the estate which the father had conveyed to them ; but the reason for that kind of a decree was, that, the fraudulent alienees had divested themselves of the title by a conveyance to a bona fide purchaser, and had thereby put it out of the power of their father’s creditor to reach the land which he had fraudulently conveyed to them, and which, while the title was in them, was liable to the payment of the father’s debts. And the fact that an adverse title had afterwards prevailed against the father’s title, was deemed immaterial ; because the title was an unit, and the court would not consider it as divisible, or determine the value of that of the father, but, as he had conveyed it fraudulently to the sons, it was deemed just that they should not be screened by a subsequent purchase' of another title, even though it may have been a better title. But it is evident that the decision would have been different had money instead of land been given by the father. . ,
If a party purchase property, pay for it , ith his money, and cause the conveyance to be .made to a stranger, there will be a resulting trust to the payer, and chancery will decree the property sub ject. to his debts. If the conveyance be made to his .children as an advancement., it will be good, .and the property willnot be liable to the father’s debts.-Bnt if it appears that the conveyance was not in tended as a bo-na tide advance mént, but to defeat, creditors, it wi'l be deemed fraudulent, and a sale of the property, to pay the father’s debt, may be decreed. [Judge Underwood goes even further. Judge N. thinks the property thus conveyed to chit dren, cannot be reached. — See their respective opinions,post-l
*536 What effect, if any at all, the execution law of 1828 should have on this point, in any of its bearings, need not be now intimated, because, whatever application it might have in a possible case occnring since 1828, it cannot effect this case, which must be tested by the preexisting law. ,
If the delivery of money by a father to his child, could be deemed the creation of a debt from the latter to the former, such debt might be attached under the act of 1821. But if the transaction shall be considered, as in this case, only a gift, or even a deposit in trust for the father, there would be great difficulty in shewing, either by principle or approved authority, that the chancbellor could, at common law, subject the child to liability for the money to the creditor.
But, as the money of an indebted father has been converted into land in the name of his child, if a trust for the father can be inferred, the land so conveyed to the child, nominally, but to the father, really and beneficially, may be subjected to the debts of the father’s creditors. A conveyance to a stranger would carry with it a *537 resulting trust to the person who paid the money. But the relation between H. G. Doyle and the holders of the legal title, in this case, will prevent the implication of a trust from the simple fact that the lots were bought with his money.
May not a trust result, however, for the benefit of creditors, from other circumstances?
The reason why the law will not imply a trust, as between parent and child, from the simple fact that the consideration was paid by the parent and the title was conveyed to the child, is, that from the consideration of blood, the purchase in that mode will be deemed, prima facie, an advancement by the parent to the child. But when the presumption of such an advancement can be repelled or destroyed, a trust will result bv implication, as between strangers. Thus, in the second volume of Comyn’s Digest, first American Edition, title Chancery, page 766, it is said that when a conveyance is made to the son in consideration of money paid by the father, a trust ivill result to the father, if the son had been before advanced by him; — and second Ca. Ch. is referred to as authority.
So if it appear, that land bought by the father, with his own funds, had been conveyed to his child, not for the purpose of advancing the child in good faith, but for the sinister and unlawful purpose of defrauding the precedent creditors of the father, then, as the presumption of an advancement is repelled, a trust will result to the father, for the use of his creditors, and, so far as those creditors may be concerned, equity will deem him to be the true owner.
Indulgent as the spirit of the common law certainly is to the claims and obligations incident to the filial relation, it will not permit it to be prostituted or perverted as an instrument of fraud. It will jealously scrutinize every transaction in which an indebted father ostensibly provides for his children without paying his just debts; and, if it can find, in the provision itself, or in any extraneous circumstance, a sufficient reason for strong suspicion of fraud, or trust, it will not suffer the creditor to *538 be eluded by such artifice and indirection, but will consider the parties just as they would have stood had the conveyance been made to the father, as it probably would have been if there'had been no creditors to defeat. For, when it may be satisfactorily inferred, that the conveyance was made to the child, not for the honest and benevolent purpose of making a proper advancement, but for the dishonest purpose of securing property to the father’s use by a colorable subterfuge, the chancellor should treat the estate as the father’s, on the principle of a presumed trust. Viner, title Fraud. F. — Fletcher vs. Sidley et al. Vern. 490; Styleman vs. Ashdowne, 2 Atk. 481 ; Pole vs. Pole, 1 Vez 76; Lloyd vs. Read, 1 Pr. Wms. 607; Roberts on Fraud. Con. 424, and notes. It is thought that these and other authorities abundantly establish the foregoing principle. And is it not reasonable, just, and consistent.11 Shall a debtor, after converting his whole estate into money, or after acquiring money by his credit or his industry, secure to himself the use and enjoyment of an estate, in land, or slaves, by making his family the nominal depositories of the title, merely to cover the property and defraud his creditors? Should, not the chancellor consider the transaction in its genuine, and not in its falsely simulated, character? It is, in fact, a trust — why should it not be so treated, for the benefit of -those whose rights were intended to be frustrated by a colorable arrangement, which would never have been contemplated had their claims never existed? Those judges who subjected money and chases in action in the hands of the child of an indebted parent, certainly would not have hesitated to subject property which was legally liable. The only argument ever urged against the power of the chancellor to subject a chose in action, was, that it was not liable to execution, and the chancellor had no power to make that liable to the payment of debts which the lav/ had exempted. Those who thus argued virtually conceded, that property which is liable, and may be taken from a debtor by execution, against his will, and whilst it is in his possession, could be subjected by the chancellor in the hands of a child of the debtor to whom it had been conveyed for the purpose of defrauding the *539 father’s creditors. And thus both parties, as well that which opposed as that which defended the doctrine of Lord Nortlungton, united in the opinion, that land fraudulently conveyed to the child, instead of the father, and bought with the father’s money, might be subjected to his debts. And no case or dictum to the contrary is remembered, or has been cited. If the law will, in favor of creditors, presume that land conveyed by an indebted father to a son whom he had previously advanced, is held by the son in trust for the father, will it not, a for--tiori, presume a trust when it is evident that the conveyance was made to elude creditors, and secure to the father himself a beneficial estate, so covered over as not to be tangible by the ordinary process of execution?
Roberts says, that “where the object of such original conveyance is the advancement of children, vjilhout any particular badges of fraud, the children will prevail in equity against the creditors of the parent, even though he were indebted at the time of the purchase.” What did he mean by ubadges of fraud1’ in such a case? He undoubtedly meant such circumstances as would induce the belief that the land had been bought by the father, but conveyed to the son, not for the exclusive benefit of the son, but for the benefit altogether, or in part, of the indebted parent, and that, therefore, fraud on the father’s creditors, and not a provident, bona fide advancement to his son, was the true motive of his conduct.
In Lloyd vs. Read, 1 Pr. Wms. 607, it is decided that, if the father enjoy the use or take the profits after the majority of the son, an advancement will not be intended, but a resulting trust to the father, for the benefit of his creditors, will be presumed.
In Styleman vs. Ashdowne (supra,) the father, having bought land with his own money, had it conveyed to himself and to his two sons jointly, and therefore, Lord Hardwick decreed that the title should not survive to the sons, but should be liable to the father’s debts, lie-cause that mode of conveying the title (whereby the lather might have been entitled as survivor to the whole^ ,as the sons, during minority, could not have made par *540 tition,) was incongruous and created, per se, a suspicion that-a settlement upon the sons in good faith was not the father’s object; and that, consequently, fraud on his creditors and a consequential trust to himself, might be fairly inferred.
That the intention of a father who procures an estate, purchased and paid for b,y him, to be conveyed to his children, was fraudulent, cannot be inferred from the mere fact of his indebtedness at the time ; but slight additional circumstances will justify that inference. See page 532.
For a similar reason (the unsuitableness of the ostensible provision for a child) the same kind of decree was pronounced in Pole vs. Pole, 1 Vez. 76.
Roberts uses the following language: — “disproportion between the provision and the object, as well as incongruity between the means and the end, seems to justify the inference of fraudulent intention” — “a pretended provision or advancement may be condemned by its own inadequacy and incongruity with,, respect to the design proje8sedly in the contemplation of the parent, and settler.”
It seems that, upon common law principles, fraud will not be inferred from the naked circumstance that the father was indebted when the money was advanced by him, and the title, at his instance, conveyed to his child.. Some subsidiary fact, either intrinsic or extraneous, will be required by the circumspect chancellor. But, in a transaction so liable to suspicion, slight circumstances wifi be sufficient to justify the presumption of fraud or of a trust, and to let the father’s creditors subject the land as his property in equity, so far as their claims are concerned. This position not only accords with policy and justice, but is sustained by some of the foregoing and other authorities.
If there be no valid advancement, a resulting trust for the benefit of creditors at least, is unquestionable and inevitable.
In this case, the insolvency of H. G. Doyle at the dates of the conveyances to his, children, though admitted in his answer, has not been conclusively established as against them. Nor does the record furnish the means of ascertaining satisfactorily whether there was any incongruity in the transaction, or whether the means were disproportionate or inadaptable to the professed end. Nevertheless all the circumstances, slight as some of them may be deemed to be individually, arc *541 .sufficient, when considered altogether, to authorize the judicial deduction, that the lots were not bought by H. G. Doyle, and the titles conveyed to his two infant children, for the purpose of making an allowable and provident settlement for their education and maintenance; but that his chief, if not his only motive, was to secure the estate to his own use, and thus save it from bis creditors, by the ostensible intervention of his children’s title.
Parties in this court may waive objections to the preparation of a chancery cause, in the court below, and have a decision here on the merits.— Andparties who being infants,an swered by guardian ad litem, may thus sanction such answer.— Against its denial, the chancellor will notpresumefhat an estate conveyed to them by their father, was intended as an advancement [Judge N. contra, post.]
His ascertained insolvency shortly after the dates of the deeds, is evidence against the children. And not only he, but they also deny that there was any advancement. It is true, that the certificate of publication against them was not perfectly regular; but they are parties here, and have expressly waived all objection that might have been made to the regularity of the proceedings as to parties in the circuit court, and have insisted on a decision on the merits of the case. They have thus recognised and sanctioned the answer filed by their guardian ad litem. Sue!) an answer, in such a case, must have some effect. The answer, so far as it renounces the idea of an advancement, is not only not contradicted by proof, but accords with the intrinsic probability resulting from the complexion of the whole case. The chancellor should not therefore presume, that the purchase and conveyance of the lots was an advancement by the father to his children, when such a claim is not only not pretended, but is denied by all the parties, and is in itself scarcely probable. Such a presumption against the answer even of infants is not proper or allowable.
All things considered, the facts preponderate against the inference that H. G. Doyle intended a bona fide advancement to his children, and tend to prove that his object was to defeat the claims of his creditors, by purchasing, for his own benefit, and having conveyed to his children, property which would have been conveyed to himself had there been no creditors; and that, consequently, so far as such creditors are concerned, he should be deemed, in equity, the true and only owner of the estate. Of course, it may be subjected to the judgment of the defendants. A valid settlement on the children cannot be presumed, contrary to the allegations of *542 the answers anti to the tendency of other circumstances in the case; and, there being no valid advancement, a trust results necessarily for the benefit of the defendants as precedent, bona fide- creditors..
The chancellor, in decreeing the sale of real estate, should follow the law,and (unless there is' a special cause for selling the whole) sell so much only as will satisfy the decree. — [See the opinions of Judge TJnder-woodand Judge Nicholas, post -last paragraph ofeach.]
in such a case as this, conclusive evidence of fraud or of a trust, should not be required or expected; and if the facts exhibited in this case, when properly scrutinized and legitimately applied, are insufficient for subjecting the lots, the intrinsic difficulty of producing more satisfactory proof in any case of a similar kind, would tend to frustrate justice, encourage frauds, and pervert the sympathies and obligations of kindred into polluted agencies of successful and dishonest strata gem.
But the chancellor, when he decrees-the sale of real estate, should follow the law, and sell so much only as shall be necessary for satisfying the decree; unless, from the indivisible character of the estate, or from some other cause, a sale of the whole shall appear to be more advantageous to the owner, or unless he shall assent to such a sale. ' No such reason for a peremptory sále of either of the entire frictions of the lots, appears in this record; and therefore, as. the decree ‘directed such a sale, it must be deemed to be erroneous and prejudicial in that particular, and must, for that cause, be reversed.
In remanding the case it would have been proper to allow other answers to be filed, had not the agreement of the parties in this court required a final decision on the merits, and waived objection to the preparation of the case in the circuit court.
Wherefore, it is decreed and ordered that the decree of the circuit court be reversed, and the cause remanded for further proceedings according to the effect of. the agreement filed.
The defendants must pay the plaintiffs in error their costs in this court.
As Judge Nicholas dissents, and Judge Underwood, though he concurs'in the conclusion of this opinion, attains that end by a process in some respects different, it has become necessary that the members of the court should deliver their respective opinions seriatim.
Opinion of Judge Underwood: who conceives that, if a father, who is insolvent, buys an estate, jKys for it, and has the title made to his children, it is a fraud upon his creditors —and the estate a trust in the hands of the children, \thich should be held liable for the father’s piior debt
Where a debtor has effects subject to execution, and so disposes of them, that they cannot be reached by his creditors, it is fraudulent, not only in him, but in the party who accepts or receives the effects.
Money may be. taken under execution. See p. 634.
A man may defray the current, necessary se3 of his children, though it render him unable, or less able, to pay his 534, also Judge Nicholas’ opinion, post.] JBut he has no right to set apart a large fund, or purchase estates, the income to be applied to that purpose, and thus disable himself from paying his debts — sttch funds and estates should be held liable to his debts. debts. [See p.
Judge Underwood
: — As my views of this case differ from those of my brethren, I deem it proper to deliver a separate opinion. The result of my investigation is, that the estate conveyed by Lucas to Doyle’s children, was properly subjected, by the decree of the circuit court, to the payment of his debts contracted previous to the conveyance.
Doyle contracted the debt to Sleeper and Aisop, in 1818. Lucas, at his instance, and in consideration of his money,.conveyed the estates to his children, in 1825 and 1827. Doyle’s insolvency was ascertained, by a return of nulla bona upon the execution, in 1829.
I hold it to be a fraud for the debtor, after contracting the debt, to disable himself, so that he cannot pay it, by disposing of his money or property, which the law subjects to the payment of his debts, in such manner that it cannot be reached by the ordinary process of execution ; unless the disposition be made in discharge of obligations, legal or moral.
I hold it to be fraudulent for a person to accept, and hold as a gift, the money or property of an insolvent debtor, and thereby deieat the payment of preexistent debts.
The reason of these rules is very obvious. The creditor trusts the funds in his debtor’s hands, which the law has subjected to the payment of the debt. Good faith requires the debtor to have those funds forthcoming to satisfy the demand. The creditor is deceived and honesty violated by any disposition of the funds which defeats the payment of the debt, unless it be made on valuable consideration, or in discharge of obligations enjoined by law. Gratuities cannot be tolerated at the expense of justice.
Money is liable to execution, and may be levied by the officer. First vs. Miller, 4 Bibb, 311; Turner vs. Fendall, 1 Cranch, 117; Cond. Rep. 261.
The money which Doyle paid Lucas was subjected by the principles of the law, to the payment of the debt *544 due Sleeper and Alsop. Doyle failed to apply it in sa* t¡«faction of the debt. He handed it to Lucas, as a consideration and inducement to the execution of the deeds to his children; thereby substituting in lieu of the money, which lie owned, estates for his children, the title to which was never in him, and upon which no execution in favor of Sleeper and Alsop could be levied.
The proof of these facts is, to my mind, proof of actual fraud. Why did Doyle thus disable himself, and divert his means from the satisfaction of an existing debt? Was he under any legal or moral obligation to do so? None whatever. I admit that a man is both legally and morally bound to provide necessaries for his children. I also concede#that he majr, and ought to provide necessaries for them at the expense of his creditors; that is, he should use so much-of the property in his hands as would furnish his children with food and raiment, and such education as is suitable to their condi tion in life, although by so doing he might subtract from the means of paying his just debts. But beyond that, he has no right, founded on law or morals, as I conceive, to provide for his children at the expense of creditors. It is the present wants of children, or wants of the current year, which may be supplied under the idea of necessaries, and not such as may be anticipated in future years. Hence I reject the idea that a father can give to his infant son, a year old, two thousand dollars, upon the supposition that it will require a hundred dollars per annum to supply him with necessaries during his minority. How can he tell that his son will live so long? Indeed, I reject the idea of a donation, or setting apart of funds for the use of the child, while the father is indebted, altogether.
The child during minority is, in legal contemplation, subject to disabilities, and requires the parent to act for him. If funds were, therefore, given, it would be the parent’s duty, as natural or statutory guardian, to manage them. The extent therefore to which the doctrine of supplying a child with necessaries can be carried, is to allow the parent to use his means for the present benefit, for the maintainance and education of his child from *545 year to year, as above; and if in so doing, be becomes less able to pay his debts, and a greater loss falls on creditors, they have no ground to complain of a fraudulent appropriation of the debtor’s means. Debtors, howevr er, often think, or pretend to think, that they may go much further in point of morality, and would have the Jaw fashioned accordingly. It is a difficult thing to bring home to the conscience of the debtor, the fact) that creditors feel hunger and cold, and may have wives and children whose wants are to be supplied. The statutes against fraudulent conveyances and the common law rules, discountenancing all manner of fraud, are designed to teach debtors the truth in respect to the rights of creditors, and to compel them to do justice. These rules and the policy of the statutes would entirely fail of their object, if a debtor could defeat preexistent creditors by converting his property into money and vesting the money in estates for his children.
Notwithstanding the impolicy of such a doctrine, if it lias been settled by authoritative adjudications, I should feel myself bound by them, and leave it to the legislature to change the rule. I have not in my researches found that unbroken chain of decisions which should be regarded as settling the question, and therefore feel at liberty to establish tire rule in conformity to the dictates of reason and justice.
But I am far from admitting, that I am without support by former adjudications. On the contrary, I think the principles heretofore recognised, in cases to which I shall briefly refer, fully sustain the doctrine now contended for,
The case of Halbert &c. vs. Grant is in point, or admits of so small a difference that it ought to be discarded. (See 4 Mon. 590.) in that case, the father conveyed his estate fraudulently to his sons. Afterwards being evicted by paramount title, he purchased in that title, but had the conveyance made to one of his sons to defeat creditors. The court subjected the title, thus conveyed to the son, and which the father never owned, to the payment of the father’s debts. Now' the only difference between that case and this, is, there the fa *546 ther once claimed the land before the successful claimant conveyed it to the son; here it does not appear that Doyle ever claimed the land before it was conveyed to his children. The difference, I think, amounts to nothing; for, by the recovery in the ejectment, it was judicially determined, that old Grant had no title. His only interest was a claim for improvements that he surrendered as the consideration for the conveyance to his son. Suppose the successful claimant had paid the money for the improvements and entered on the land : suppose lie had thereafter conveyed the land to regain the money, would there have been any difference between that case and the present? None in principle. The fail' ure to pay the money cannot change the principle, when a discharge of the liability to pay it is made the consideration of the conveyance. Such a discharge is equivalent to the payment and return of the money, and the parties by the arrangement saved the trouble of counting. The court do say that, “if the land had never before been possessed by the father, and conveyed fraudulently by him, and he then had hecome for the first time the purchaser thereof, with his money, and had directed it to be conveyed to one of his children, as it would, in that event, never have been subject to his debts, there would have been some ground for contending that it could not now be subjected.” No more ground for it, I think, than there would be to subject the title of Doyle’s children in this case to his debts, because he had disseiz-ed Lucas, and was in possession claiming the land at the time he procured the conveyances from him to the children. I cannot perceive any reason for divesting infant children or adults of a good title, which the father never owned, merely because the father set up claim to the land and got in possession, and acted fraudulently, upon the supposition that he was the owner. I see no propriety in staining the title of the children with the black frauds of the father, over which they had no control. I will not resort to such pretexts for subjecting the estate to the payment of the father’s debts. They are irrelevant. I prefer enquiring directly as to the payment of the consideration, and if I find it was entirely paid *547 by the father, I am prepared to carry out the opinion of Lord Northington, in Partridge vs. Gopp, “that no man has such a power over his property as that he can dispose of it so as to defeat his creditors, unless for consideration.” Halbert &c. vs. Grant points out the road to reach property when the fraudulent donee or grantee has made way with it.
Property purchased and paid for by a parent, and conveyed to hischiidren,.can not be reached by a subsequent creditor of the parent, by the rules of the common law. Nor are such purchases within the statutes against frau dulent conveyances.
But where one who is in debt purchases property and has the conveyance made to another, such grantee is but a trustee for the party who paid the consideration, the property is liable for his debts,upon com mon law principles. [See the concurrent view-oftheC. J. page 536, and also of Judge N. post.] The case of a fatherintending, in that .' ay, to advance his chil dren should not constitute an exception to this general rule.— [Ch. Jus. and Judge N. c<m-tra, p. 536, and post.]
I admit, that where a parent advances the consideration, and takes or procures a conveyance to his child, the property conveyed cannot be reached by a subsequent creditor, upon the principies of the common law. The reason is obvious, the consideration thus advanced could never have been a fund to which the subsequent creditor looked for the satisfaction of his demand, and therefore it is impossible that such creditor could have been cheated or defrauded by the transaction. But the English courts, in order to give the most beneficial operation to their statute's against fraudulent conveyances, have, where the grantor was indebted at the time, set-aside the conveyance in behalf of subsequent as well as prior creditors. They have also denounced conveyances made, when the grantor was not indebted, but in contemplation of future indebtedness. I also concede that the weight of authority, in limiting the effect and operation of the statute, has confined it to alienations; and not permitted it to embrace purchases. As, therefore, Doyle never had the estates in question, and never conveyed them, there is nothing for the statutes agaiost fraudulent conveyances to operate upon. The property is not subjected to the payment of Doyle’s debts in virtue of those statutes, but upon a different principle; to wit: the iniquity of suffering the funds of the debtor to be diverted from the payment of subsisting debts, and gratuitously transferred to children. The case of Crozier vs. Young, 3 Mon. 157, shows that the statute of 13th Elizabeth, and our statute relative to fraudulent conveyances do not embrace the present case. But (he concluding remarks of the court, in Crazier vs. Young, clearly shew, that Young was a subsequent, and not a preexistent creditor; and therefore, in the language of the court, not entitled to the protection of the common law against the *548 effect of the fraudulent transaction. Sleeper and Alsop are situated so as to avail themselves of that protection, being preexistent creditors; and therefore have a right to say to Doyle and his children, “you shall not use the funds which ought to be appropriated to the payment of our debt for the purpose of securing estates to yourselves whilst I am unpaid.”
-There are other well settled principles of the law, which, when permitted to operate according to the reasons on which they are founded, will show that the lots conveyed by Lucas to Doyle’s children, should be subjected to the payment of Doyle’s debt to Sleeper and Alsop.
Where the purchase money is paid by one, with his money, and the estate is conveyed to another, the grantee is a trustee for the payer. This is not denied by Judge Nicholas, as a general proposition; but he, and the Chief Justice likewise, lays it down as an exception to the general rule, that where the father pays the purchase money, and takes the conveyance to a child, then the relation of blood destroys the resulting trust, and confirms the title to the child, as an advancement. Now, I admit that when the father’s circumstances are such that he has something to spare, it is very proper to regard the estate conveyed at his instance to the child, and paid for by him, as an advancement. But when the father has nothing; when, if he would act' honestly and pay his debts to the extent of his means; he is insolvent; when in truth he has nothing to advance which he ought to call his own, I cannot consecrate, as an advancement to the child, property paid for .by the father. The general doctrine is, that a trust results in favor of the payer whose mpney is used; the exception is in favor of the child claiming to be advanced. But will the law make such exception when it perceives clearly, that the father was cheating creditors in making the advancement? Certainly not; for if it did, the law would countenance fraud. Even were it conceded, that the advancement of á child is to be favored in law, I should say, with Roberts, that “all the partialities of the law expire under its antipathy to fraud.”
*549 Whether a trust might not have resulted to Crozier,' iron) the purchase by him of stock in the names of his children, in consequence of his indebtedness at the time, had the transaction been impeached by a preexistent creditor, seems not to have been considered by the court. So far as the court touches the question of a trust, it speaks of an express trust, or a secret trust, and says there was no evidence of either which would authorize the property to be reached under the twenty third section of the act of 1798, or by bill in chancery. All this is true, looking on Young in the light of a subsequent creditor. But if he had been a preexistent creditor, then the insolvency of Crozier, and his purchasing stock in the names of his children, would have been sufficient facts on which to justify the inference that the intent of the whole transaction was to secure the means of comfortable living in the family, at the expense of' creditors; and that the father intended to repose upon the sympathy, and rely upon the means of his children, secured to them by his fraud, for support and aid. Under such facts, I should make the children trustees for creditors, as in the case of Halbert &c. vs. Grant. I would infer the existence of a secret trust between the father who would thus secure, and the children who would thus accept property1. I could not doubt the correctness of the inference based upon such facts. The opinion of the world would constrain children who have been enriched by a parent, to prevent his coming to absolute want. There are associations connected with the name of father, which influence children to supply the wants of the parent — no matter how undeserving he may be. The fraudulent debtor is tempted to take advantage of these things, and therefore, is disposed to throw property and money into the hands of his children, knowing full well that such a fund will in some degree administer to his wants in time of need. Shall it be allowed? I cannot consent to it.
Why does a trust result in behalf of the payer whose money is used when the conveyance is made to another? There can be no good reason for it, unless it be found in the intrinsic justice of giving the estate to him whose *550 money paid for it. Why should Doyle’s children be regarded as trustees for his preexistent creditors? For a reason precisely of the same kind, to wit: the money which paid for the property ought, in justice, to have been paid to the creditors. Fraud changed its destination. It is the province of the chancellor to set aside the fraud, and give the avails of the money that destination which would have been given to the money, had honesty prevailed in the first instance. The identical dollars which Doyle paid to Lucas, cannot be reached, not only because they have no ear marks, but because they have passed into innocent hands. Still there is as mncli propriety in reaching the property paid for by those dollars as there was, in Halbert Sic. vs. Grant, in holding the sous, the fraudulent grantees, to an account for the money received from the sales of the property conveyed to them, or for the value of the property where it was removed, destroyed, or put out of the way in any manner. All is to be done under the sanction of the principle, that lie who comes to an estate which costs him nothing, shall be trustee for him who had, or ought to have had, the money which paid for it.
I am, however, of opinion that there is error in the decree so far as it directs the whole of the ground described in the first deed from Lucas to Doyle’s children, to be sold, and if that should be insufficient to pay the debt, then the whole of the ground mentioned in the second deed to be sold. I think the direction should have been, to sell so much only as was sufficient to pay the debt. The chancellor should conform to the law regulating sales of land under execution. It is urged that, as these were portions of a town lot, it should be regarded as an exception, because the balance left might be so small as to be worthless. That I think is a matter which the court has nothing to do with. The law has wisely left it with bidders who are presumed to know the situation of the property they purchase, and if a division would destroy the value of the property, the officer'will not get a bid. for less than the whole, and if the debt, can he paid with less than the whole, it will leave a part which must be presumed to be of some value. *551 The only possible injury which the debtor can sustain, will result from the possibility or probability, that there are persons who would bid for the whole lot or portion, who would not bid for part; and thus if the whole could be sold, more could be realized than if part only was sold. It i’s a sufficient answer to this, that the law has not provided for the case. In point of policy, I believe the law ought not to provide for it. In nine cases out of ten, property sells better in small parcels than in the lump. The law may proceed upon the idea of sacrifices at forced sales, and therefore, thought it best to sell as little of the property as possible. It is enough for me that the law has given no authority to our courts to decide on the divisibility of lands when offered for sale. Shall a chancellor undertake to say that the whole of a town lot must be sold together in all cases, or how many feeé¿be will have sold in the different parcels ? Will he have the cause burdened with depositions to prove how it can be sold to most advantage, and direct accordingly ? The difficulties which suggest themselves, satisfy rae that he ought only to direct a sale of so much as would pay the debt and charges, and leave it to the commissioner and bidders to ascertain the part necessary to raise the amount. For this error, I think the decree should be reversed.
Opinion- and Dissent of
— ^ ^"stranger without consi-purchase in his «ame, creates a inSfavw of*the grantor, or payer of the chase money — aliter where the conveyance is to, or the purchase in the names of, infant children. The implication from such purchase, is, that it was made for their advancement. .This implication has never been destroyed in favor of a purchaser from the father. Neither should it be in favor of creditors, on the ground that the purchase was so made to de-fraudjtnem. It is too well settled, to be now called in question, that the donee of money cannot be pursued by the cieditors of the donor. A purchase in the names of infant child-eñ, is but a donation of the purchase money, and neither prior or subsequent creditors can subject property so purchased. The question has not been effected by the statutes subjecting chnses inaction, and equitable interests, after a return of " no property” to a fi. fa.
Judge Nicholas
: — The question presented, is, whether a purchase of land made by a father in the names of his infant children, can be subjected to the payment of his debts contracted prior to the purchase.
It is contended, that a court of equity has always possessed the power to subject such purchase to the satisfaction of creditors ; and if not, then, that it has been conferred by our state legislation, subjecting choses in action to the payment of debts, and authorizing bills against debtors, for the discovery of their effects.
*552 Where lands are conveyed to a stranger without consideration., or purchased in his name, he paying no part of the purchase money, there will be a resulting trust in favor of the grantor, or payer.of the purchase money. But this does not hold where the conveyance is from, or the purchase is made by, a father, in the name of an infant child, even though he enters and takes the profits during the child’s minority. The reason of the difference is, because, between father and child, blood is a sufficient consideration to raise a use, and such conveyance, or purchase, will he deemed an advancement.— 1 Cruise, 477 ; Grey vs. Grey, 1 Cha. Ca. 296 ; Mumma vs. Mumma, 2 Vern. 19; Taylor vs. Taylor, Atk. 386.
The subsequent sale and conveyance by the father, of the estate to a bona fide purchaser, for a valuable consideration will not rebut or destroy this implication in favor of the child, or bring the case so far within the operation of the statute against fraudulent conveyances, as to protect the purchaser. Lady George's case, cited Cro. Car. 550 ; Back vs. Andrews, 2 Vern. 120 ; Pre. in Chy. I; Roberts' Frau. Con. 463.
Nor has it ever yet been determined, that the statute avoids such transaction in favor of creditors, or that the estate so purchased could be .subjected to their demands.
In Stileman vs. Ashown, 2 Atk. 477, it was held by-Lord Hardwicke, that the circumstance of the estate being taken jointly to the father and child, and the use of a moiety, with power of severance, thereby secured to the father, with a chapee of survivorship, so far destroyed the implication in favor of the child, as to prevent his taking the whole by survivorship, and a moiety' of the estate was by him decreed to be sold in satisfaction of a creditor. But this case rather tends to shew, that if the father had taken no part of the estate to himself, the decision would have been different. For if the estate would otherwise have been liable to creditors, there was no necessity for Lord Hardwicke’s seizing hold of that circumstance, to repel the implication, there would have been in favor of the child, and which *553 would have rebutted any resulting trust in favor of the father.
Titis deduction is much fortified by what fell from Lord King, in Proctor vs. Warren, Sel. Cha. Ca. Vin. Mr. title Fraud q. a. 2, that he did not know it had ever been determined, tiiat if a man, being indebted, has an estate originally conveyed to his children by way of provision for them, it should be subject to his debts.— Also bv the case of Fletcher vs. Sidley, 2 Vern 490, and I Eq. Ca. Abr. where A purchased a term in the name of a trustee, in trust for himself for life, and after his death, for a woman living with him as his wife; upon bill filed by creditors, after his death, it was held the residue of the term was not subject to his debts, because it never was in him. See Ridler vs. Punter, Cro. Eliz. 291, to the same, effect. Mr. Roberts comes to the same conclusion as to the law on this subject ; as did also this court in the case of Crozier vs. Young, 3 Mon. 158.
No authoritv has been met with, affirming that a purchase in the name of a child can be subjected to the pavment of the father’s debts, unless that of Mr. Mathews, in a recent work of merit, on the law of presumptive evidence, may be esteemed as such. He thinks that it can, though he admits no case has ever yet so determined. He argues, that, as a general rule, where a man purchases an estate in the name of another, he is entitled to it bv way of resulting trust, and that this is not the case where the purchase is in the name of a child, only because of the repellant presumption, that it was made by wav of advancement, and that where creditors are to be affected, such presumption should not be allowed to prevail. This argument forgets, that the whole trust in favor of the payer of the purchase money, is itself the creature of a mere presumption, which, like all others, can only stand so long as there is none other as strong or stronger against it; and therefore, when it is admitted, as all the authorities agree it must be, that the presumption in favor of the child, rationallv as well as legally, outweighs the other, there is, in point of fact, no presumption whatever in favor of the father, and a court of equity has just as much right to make it, as it has to *554 manufacture any other fact, and no more. If a court of equity holds such power over facts, or, which is the same, over the presumption of them, why has it not been made to operate in favor of, and for the protection of, bona fide purchasers from the father? A much more potent and beneficial effect, has always been given to the statutes against fraudulent conveyances, in the protection of purchasers, than of creditors. Yet it is admitted even bv Mr. Mathews himself, and all the books shew it, that a purchaser cannot be protected by any such arbitrary destruction of presumptions.
It will not do to respond, that, creditors have an existing interest in all the property aud effects of a debtor, at the time he makes the purchase-in the name of his child, which mav he thereby prejudiced, whereas, the subsequent purchaser has no such interest. Such reasoning would go to sustain all voluntary conveyances against subsequent purchasers. The statute avoids only such conveyances as are made with intent to deceive or defraud purchasers. .Now it may well he, that a voluntary conveyance was made with no such intent; yet, in order to give full effect to the statute, the courts have held that the subsequent sale, though a matter ex post facto merely, gives character to the transaction ab origine, and furnishes, in protection of the purchaser, uncontrollable evidence of an original intent to deceive. After the indulgence of such latitude of construction and presumption, to protect purchasers against voluntary co n-vevances, whv have not the courts for their protection against purchases by parents in the names of children, exercised the power of destroying the presumption in favor of the latter, if they possess any such power? The failure to exercise it, must be taken as conclusive of its nonexistence.
This idea of a resulting trust in favor of the father for the benefit of creditors, is susceptible of another answer, by what fell from this court in the case of Crozier vs. Young, 3 Mon. 159. In that case, creditors were seeking, by hill in equity, to subject stock purchased by an insolvent father in the name of his children. In ascertaining whether the case came within the act of 1796, *555 which subjects estates of every kind held in trust, to the debts of those for whose benefit they are holden, the court said: “under this provision, if a debtor should take a conveyance originally to a third person, in trust for himself, the thing so conveyed would-be liable to his debts. If the trust, in such case, be expressed on the face of the deed, the thing so conveved would be subject to be taken and sold under execution; and if the trust be a secret one, and not expressed in the conveyance, a court of equity might interpose to subject it to the payment of debts, &c. But, in this case, the subscription of the stock does not purport to be made in trust for Crozier, nor is there any proof of a secret trust to that effect. The stock, therefore, cannot be liable to pay Crozier’s debts, &c. And it was held not to come within the act of lb20, because, that only subjects dioses in action belonging to the debtor and equitable interests to which he may be entitled, and the stock never did belong to Crozier, and he had no title to it in law or equity.”
Another ground on which Mr. Mathews relies, is, that a voluntary donation of money made by one indebted, is fraudulent under the .statute, and will be pursued by a court of chancery, into the hands of the donee, and so, pari ratiane, where the money is not directly given, but is bestowed through means of a purchase in the name of the child, it-should be pursued into the estate .purchased, in behalf of a creditor. In support of his proposition, that money may be so followed into the hands of the donee, he relies upon the observations on Fletcher vs Sidley, made by Lord Hardwicke in Monk vs. Peacock, 1 Vez. 127, and the decision of Lord Northington, in Partridge vs. Gopp Amb. 596.
In the argument of Fletcher vs. Sidley, it was said by counsel, that the remainder of the term could not be assets for creditors of the purchaser, because the estate never was in hnn; that, as he might have given the money to the defendant, so he might purchase witii it for her benefit; that it was a new pretence, to saya man-might make a purchase fraudulently; that he could not alien in fraud of creditors, but as to purchasing for another, he might do it, or let it alone. And to that opm- *556 ion, says the (rook, the Lord Keeper inclined. When this case was cited before Lord Hardwicke, in Monk vs. Peacock, he said it was only the inclination of the court uPon argument of counsel, and it would be dangerous allow the arguments that are there. To which of the arguments he had reference as dangerous, it is difScult to conjecture; for, as has been before shewn* bx gave countenance to the result of the whole by his do* cisión in Stileman vs. Ashdown. But it is very centcin, he could have had no reference to that which assumes the right to give money, for his own determination in that very case of Monk vs. Peacock, is a strong authority against the right of the chancellor t.o pursue money-in the hands of a donee.
That case was this: A made his will, appointing B his executor, and residuary legatee, and by deed of same day, vests four thousand pounds in B, to pay an annuity to A for life, and by both instruments directs one thousand pounds apiece to be paid to C and D. It was held to be a voluntary and testamentary act, and void against creditors within the statute, 13th Elizabeth. And the one thousand pounds apiece to C and D decreed to bo assets. In delivering his opinion upon the case, he held this language: ‘‘Though money has no ear mark, yet, if in trust, it is another matter; for though it be not the specific four thousand pounds that was paid, it is the profits thereof. Monk being both executor and contractor in the deed, and both instruments being done at the same instant, it speaks the whole to be a testamentary act. Wherever a court of equity finds such a tuiui given to a transaction, to defeat creditors, reserving the benefit of it to the person himself, the court will be very nice to find out a distinction for creditors. It is true indeed, a man may give money in his lifetime as he pleases, without creditors calling to an account, or having it refunded; but then he must absolutely part with the benefit of it during his life, otherwise a court of equity will enquire very strictly into it.” If such explicit language from so eminent a source, needed support, it is to be found in a case reported by Viner, title Fraud, pi. 27 — where a man, being much indebted, gave six hundred pounds for the *557 benefit of his younger children, six hours before his death: such gift was held not to be fraudulent against creditors. The subsequent and contrary determination of Lord Northington, in Partridge vs. Gopp, without noticing either of these cases, is either entitled to no weight as an authority, or only in a case similarly circumstanced. It was a bill against an executor for a large legacy. After a decree against him to account, and pending the suit, he gave his four daughters five hundred pounds each, and as to two of them, on their wedding days, as marriage portions, in pursuance of a previous promise. These two, it was held, had a sufficient consideration to uphold the gifts, and they were irrecoverable; but the single daughters were decreed to refund to the creditor what had been given to them — his Lordship thinking the gifts to them fraudulent within the loth Elizabeth. The correctness of this decision was challenged at the bar, at the time of its delivery, and Mr. Roberts does not hesitate to disapprove it. It is, however, an authority in support of the decision of this court in Crozier vs. Young, that the money cannot be recovered back from one who pays value for it, though so far as concerned the insolvent purchaser, it was a fraudulent donation to his child.
If it be true, as declared by Lord Hardwicke, that a man may.give away his money as he pleases, without creditors calling to an account, or having it refunded, there can be no sound reason, of either law or policy, for enabling a creditor to reach donated money when the donation is made through a purchase of real estate in the name of the donee. Such purchase, is in effect, nothing more than a mere donation of the purchase money.
It would seem then, that in these cases of purchases by a father, in the name of his children, the points ruled in Crozier vs. Young — that the money cannot be reached in the hands of the vendor, and that there is no resulting trust in the property in favor of the father, for the benefit of his creditors — are not impugnable, but on the contrary, are well sustained by authority.
liffeotofthe statutes subjecting a debtor’s dio-ses in action and equitable interests, considered.
. But — strange to say — the case of Crozier vs. Young, is-seriously relied on by counsel, as an authority in iavor of the relief sought here. This is done on the ground of an alleged implication, deducible from the case, that if the creditors there had been prior, instead of subsequent, there was some undivulged principle of the common law, which would have afforded them relief. When the court had decided that the money paid by Crozier, could not be got at, and that he had no interest whatever in the stock, direct or resulting, legal or equitable, they had decided the whole case; and the ex gratia en-quiry as to the rights of the'creditors, under the principles of the common law, was probably only indulged in, because of the easy answer, to such pretence: that is, that the common law did not protect subsequent creditors-against prior voluntary conveyances. The cases of Buford vs. Buford, 1 Bibb, 305, Winebrinner vs. Weisiger, 3 Mon. 36, and Cosby vs. Ross, 3 J. J. Mar. 291, are full and-perfect authorities to shew, that a court of equity cannot, in favor of creditors, create a fund not otherwise liable by law for payment of debts, and it would be doing great injustice to the court to deduce by mere implication from Crozier vs. Young, the intimation of any opinion to the contrary. In the subsequent case of Halbert vs. Grant, 4 Mon. 590, there is a much more explicit intimation, that creditors cannot reach land purchased by a father in the name of his child.
it remains to be determined whether any change in the law on this subject has been produced by the statutory provisions of this State, subjecting dioses in action and equitable interests, and which authorize a creditor to file a bill for the discovery of all dioses in action, and other property or estate, real, personal or mixed, in which the debtor may have any interest. That so much thereof as subjects dioses in action and equitable interests has produced no change, has already been decided in Crozier vs. Young, and it is very clear, that no alteration can have been made by so much as authorizes the bill of discovery. This last has created no new subject for the payment of debts, but. merely furnishes a new remedy, or mode of getting at those things already made liable. *559 This is strictly true, even as it regards money in the possession of the debtor. For upon full consideration, it was expressly determined, Turner vs. Fendall, 1 Cran 133, that money is liable to, and may he taken by an officer, to satisfy an execution. It will not do to give the act such interpretation or effect, as will enable a creditor to pursue money which was once his debtor’s, into whose-soever hands it mav have come. The better, and indeed what seems to be the only practical construction of the act, is, to restrict if to such money as he had at the filing of the bill, and that it would be improper to attempt to trace it, even after bill filed, farther than into the hands of a voluntary donee. Considerations of public convenience would forbid the giving to a creditor a specific lien on even the money which the debtor had at the filing of the bill, or mio-ht afterwards acquire pending the suit, so as to prevent his parting with it, bona fide, for a valuable consideration. The coercive efficacy of the bill of discovery furnished by the statute, is no greater, if so great, as that afforded by the ca. sa. During the existence of that writ, purchases made in the names of children, were not deemed void, or in trust for the father or his creditors because that if he had waited till the writ was used against him, the means employed in making the purchase would have been taken away. Nor can it now be deduced as a consequence of our act, that the children cannot therefore hold such purchase against creditors. Indeed, all the reasons used in Crazier vs. Young, to shew that case did not fall within the statute against fraudulent conveyances, are still pertinent, and apply with equal force to this case.
The lot in question never was held by the father. He had at no time any properly in it, either legal or equitable, and, of course, none could have passed from him to the children. By the purchase and conveyance, they became vested with the legal right and title to the lot, and took it not from him, but from the vendor. The purchase money indeed was his; but it is not the money paid which is sought by the creditor to be made subject to his debt, nor could it, if such were the object, be made liable to his debt; not only because money has no *560 car mark, but because the money has passed into the hands of the vendor, who paid value for it, and cannot therefore be deprived of it. But it is the lot, and not the money, which the creditor is pursuing, and that never was his, or conveyed by him to bis children.
It is conceded to be a gross imperfection in the law, if an insolvent debtor holding a large estate, can convert it into money, and with the money, purchase other proper* ty in the names of his children, to the exclusion of his creditors. But the evil is no greater, nor the fraud one whit more enormous, than it is to permit him to turn his estate into money, and then give the money to his children, without any power on the part of the creditors to compel the children to account for it. The injury to the creditor is precisely the same in the one way as the other, and equal facility is afforded the debtor to defraud his creditors for the sake of his children. We, therefore, gain no ground in the prevention of fraud — - we subserve the substantial interests of creditors nothing, by denouncing and prohibiting the one mode, whilst we allow the other. Besides the absence of all motive on the score of general policy, to make any distinction between them, they do in truth, in a legal point of view, stand upon the precise same footing. Money, as it has been shewn, is like all other property, subject to levy, and liable to be taken under execution. As a general rule, all voluntary alienations.of property subject to execution are fraudulent and void as to creditors, and a court of chancery will assist the creditor in getting the property so alienated. Yet a court of chancery will not make the voluntary donee of money pay it over, or account for it, to the creditor of the donor. This is, in the language of Roberts, because the character of the thing presents a natural boundary to the efforts of the law in pursuing the redress of creditors against voluntary alienations. The court of chancery acts merely as the handmaid of the law, assisting the creditor to get at such things as the creditor obtains a lien upon by virtue of his execution. Hence the rule which requires the creditor to issue an execution on his judgment, before the chancellor will assist him. But as the execution gives no *561 lien upon money, either in the hands of the debtor or his donee, and as the chancellor has no power of creating a fund for the satisfaction of the creditor, beyond his lien, or of subjecting the money, if it had remained in the hands of the donor, he has no right to subject it in the hands of the donee. If, then, he has no power of subjecting the money in the hands of the donee, neither can he have the power of subjecting property which the donee may have purchased with the money. It is true he does pursue money into property with which it has been bought, in cases of. resulting trust, but that.is because of the trust. As between the donor and donee of money, there is no trust. If there were, or if it could be made out for the sake of creditors, then, since our statute subjecting choses in action by bill in equity, he might, in all cases, subject the money itself in the hands of the donee, or make him account for it, for the benefit of creditors. Nor would it matter as to the amount ; all voluntary donations are fraudulent as to creditors, whether large or small. If then the chancellor could neither subject the money in the hands of the donee, nor its avails when converted into property by him, why should he subject the property when bought by the donor for and in the name of the donee ? No legal reason or principle of policy can be perceived for the distinction.
it is wholly impracticable to deduce a power in the chancellor to subject property purchased in the names of a debtor’s children, by any legal process of reasoning, without declaring all voluntary donations of money fraudulent as to creditors, and making the donee surrender the money or account for it. But this is what cannot now be done. It would require the overturning of too many authorities.
The only other mode suggested, is that of creating an implied trust in favor of the father, for the sake of creditors. This, it has been already shewn, cannot be done. The argument used for that purpose is not shaken, by the idea that proof of an actual fraudulent intent on the part of the father, in making the purchase, should destroy the implication of an intended adv anee *562 'ment of the child. It is conceded, that a father ought not to advance his child in fraud of his creditors ; but it is not perceived how an intention to defraud his creditors, does or can he made to destroy the implication in favor of the advancement. That circumstance is naturally calculated to fortify rather than destroy such implication. The question is one of intention merely on the part of the father. In the general, when he makes a purchase in the name of bis child, it is inferred to be by way of advancement to the child, and not for his own benefit. When you superadd the additional motive of defrauding his creditors, you exclude all room for inference that the purchase was made for his own benefit, for if made for his own benefit, then it becomes subject to his debts, which thwarts the very intent with which the purchase was made — that is, the defrauding of his creditors.— The double intent, of advancing the child and defrauding his creditors, on the contrary, may well exist, and no doubt often does, when such purchases are made.
According to the doctrine of Buford vs. Buford, I Bibb, and Croby vs. Ress, 3 J. J Mar. if, prior to our acts subjecting trust estates, equitable interests and choses in action, a debtor had created an actual resulting trust, by purchasing property in the name of a stranger, though the property was thereby beneficially his, and though he might become insolvent, and have nothing else with which to pay his creditors, yet a court of chancery could not have subjected it to the payment of even his prior debts, because it was not liable at law, and because the court has no power to create a fund for the benefit of creditors. Upon what principle then can the chancellor subject the property here, where the debtor has no beneficial interest, where there is no resulting trust in his favor ? The demands of creditors are as urgent, their equitable claim to relief as strong, if not stronger, in the case supposed than in this. What could it have availed, prior to those acts, to destroy the implication in favor of an advancement, in a case like this, because of the intent to defraud creditors, when you merely produce thereby a resulting trust in favor of the father, and when such trust itself could not have been made *563 liable to the payment of debts ? According to the doctrine of the cases referred to, the implication never could, or would have been so destroyed. The general princi-pies of law are the same now. that they were prior to those acts; and if prior thereto, they could not so destroy the implication, neit-her can they be made to do it now.
infants should “otbe prejudie-ed by any alle-gationscontam-ed m the5 a.n* guardian ad n~ an^effe^begi-vento such alie-agreement have^a decision h"re. SeeTdif-view tyr 541. *’ ws’ E
Nothing can be gained to the argument in favor of subjecting the property, from any idea of actual fraud on the part of the infants, or agreement by them to hold the property in trust for the father. For ought that we know, and according to what we should presume, they may be of such tender years, that they were incapable of being participants in an actual fraud.
The case of Halbert vs. Grant is relied upon as authority to shew the power of the chancellor to reach this property in behalf of the creditors. It is difficult to feel any weight in a case as an authority, when the judges who decide it, do not pretend to act upon the principle which is supposed to be deducible from it, but, on the contrary, expressly repudiate any such idea.
The cases of Pole vs. Pole, 1 Vez. 76, and Lloyd vs. Read, 1 Pr. Wms. 607, which are also relied on, prove nothing but the uncontested point that the implication in favor of an advancement of the child, may be rebutted. They do not even conduce to shew that the fact' of the purchase having been made to defraud creditors,, will be sufficient to rebut it.
’ If the view of the subject before us, here taken, be incorrect, and the fact that the purchase was made with , . , . . , r the intent to defraud creditors, would subject the property to their demands,, it is not perceived how the actual fraud is to be made out here. It is admitted not to arise from the proof, but is supposed to be deducible from the character of the answer of the infants. I cannot give my assent to the doctrine, which will forfeit the estate of an infant, on account of the peculiar character of the answer put in for him by his guardian ad litem. If the guardian ad litem had contented himself with his denial of the allegations of the bill, it is conceded the creditors could not, on the case as made out, have subjected the property ; but, because he thought *564 proper to add, that the property was purchased with the money of the infants, and failed to prove it, the property must, as is contended, be subjected. Neither the justice or legality of such a conclusion can be admitted. The allegation amounts to nothing more than the law would have presumed without it. It was not necessary for the infants to have alleged affirmatively, that the property was purchased by way of advancement. That is a fact deducible from the transaction of which they are entitled to the benefit, without any allegation.— The answer of an infant should be allowed to assume any shape, which the case as made out on final hearing may require for the protection of his interests. If the allegation of affirmative matter is to have the effect of prejudicing his rights, the guardian ad litem ought not to be allowed to make it. Neither is it perceived how the infants are to reap any additional prejudice from the circumstance of their having asked us, in the prosecution of their writ of error, to dispose of the case, as it stood at the hearing in the circuit court.
Real estate to be sold to satisfy a decree, or under execution should be offered entire,whenever, in consequence of the buildings upon it, or from any other cause, a division would produce a sacrifice. — The other two Judges of a different opinion. Pages 542, 550.
If it should turn out, as it has been suggested to us, that the property is insusceptible of division, by reason of its being built upon, I think it every way legal and proper, that it should be sold altogether. I have no idea that it is either legal or proper, even under an execution, to make sacrifice of property by selling a piece of a house. A reasonable construction must be given to every law. We are not to presume' the legislature meant, that less than the whole of a piece of property-should be sold where it was insusceptible of division, and where the sale of a part would produce inevitable sacrifice.