Cranch, J.,
delivered the opinion of the Court.
In May 1779, at a public sale of lots contiguous to the then bounds of Alexandria, by the executors of John Alexander, for' the benefit of his son, W. T. Alexander, (then under age,) by virtue of the will of John Alexander, — Peter Wise, for Jacob Sly, became the purchaser of a half acre lot, in fee simple rendering an annual rent of £ 26, current money of Virginia. Before any deed of conveyance was made, Faw, the defendant, purchased the lot from Sly, and on the 5th of August, 1779, obtained a deed in his own name from the executors of John Alexander in fee-sim- *118 pie, rendering an annual rent of £26 current money of Virginia, to William Thornton Alexander, who was also a party to the deed. No notice is taken, in the deed, of the existence of paper money, which was then a legal tender, but had much depreciated. Gold and silver were also current money, but were very scarce and difficult to be obtained. Marsteller, who, on the 29th of December, 1794, got an assignment of the rents and the reversion from W. T. Alexander, brought this bill to recover them from Faw.
It appears in evidence that Wise, when he bid off the lot, did not particularly understand in what kind of money the rents were to be paid, but supposed they would be payable in gold and silver, and therefore did not buy a lot for himself. That the rent was low at that time if payable in paper money, but high if payable in gold and silver, on account of its great scarcity. That the general opinion of those who attended the sale was that the rents would be payable in paper money as long as it should be current, and afterwards in gold and silver.
It is admitted by the parties that the contract was to pay the rent in such money as should be current at the time the rents would become payable. And that such was their understanding and intention at the time of executing the contract. The rents therefore were payable in paper money while that was current, but were afterwards hitherto payable in gold and silver. This being the nature of the contract, the question is whether the rents forever are to be reduced annually by the scale of depreciation established by the Act of the Virginia Assembly, passed at the November session, 1781, c. 22; Chancery revision of the Laws, p. 147 — (see 1 Wash. 341, 342); or secondly, whether those rents only which became payable during the existence of paper money, are to be scaled; or thirdly, whether the whole rent is now to be paid in gold and silver;' or lastly, whether the Court will establish any other euqitable rule for the payment of the rents.
The sum of £26 reduced by the scale for August, 1779, will be only £ 1.3s. Hid. or $ 3.94. This sum appears farther below the real value of the rent at that time, than £ 26 — or $> 86.67 was above its value. Lots in 1774, rented for 20 to 40 dollars — a lot opposite at 30 dollars in 1774 — some as high as 45 dollars of equal value; — in 1784, lots less valuable rented at 133 dollars. Hence it appears that the scale of depreciation does not form a fair and equitable rule of interpretation of the contract. Besides, it seems to me that the admission of the parties that it was their intention that the rents should be payable in money current when the rents should become due, fairly excludes the case from the operation of the scale. Each party knew that at the time of the *119 contract, the rent, if payable in paper, was far below its real value. They knew that the paper was still depreciating, and that it would at a future time cease to be a circulating medium, either by its depreciating so as finally to become of no value, or by depreciating until it gained the par of gold and silver. Either event would produce the same effect. The uncertainty of that event was a risk which each party was willing to take upon himself; and both received a premium for that risk. The benefit to Faw was the present low rent and the length of time during which it might be paid in a depreciated currency. The contemplated advantage to Alexander was the future high rent, when paper money should cease. Faw might be further induced to take the risk .of a future high rent from the probability that lots would increase rapidly in value in consequence of the progressive increase of the trade and population of the town. It seems to have been a speculation on both sides attended with no circumstance of fraud or oppression. Each party had the same means of making his calculations upon future events, and neither seems to have been disappointed in his expectations. Faw has had the opportunity of paying part of his rents in paper money, and the benefit of the increased value of the property, and it seems but right that Alexander should receive the benefit of the increased value of the currency. Parol testimony has been adduced, not to contradict or vary the deed, but to explain the ambiguous term current money of Virginia — two kinds of money being current at that lime. They have very naturally explained the general understanding of those who were at the sale, and there seems to be no reason to doubt that it was the intention and expectation of both parties, that the rent should be paid in paper while current, but afterwards in gold and silver or other money current at that time, when the rents should become payable.
The contract then seems to be divided into two parts— the one to pay paper money for a certain period, and after that to pay gold and silver. The period for paying in paper has by subsequent events been ascertained to be the 1st of January, 1782. At which time the other part of the contract took effect, which was to pay the rents in the then current money, namely, gold and silver.
The Act of Assembly seems to contemplate only those contracts in which the parties themselves have not ascertained the rehuive value of paper money and gold and silver, and not those where they may have provided against the depreciation of the money, and its final abolition. The present seems to me to have been a contract of the latter kind. Both parties seem to *120 have had a full view of the existing state of things, and to have made an equally accurate calculation of future events.
The intention of the parties makes the contract. If the intention here was, as is admitted, to pay in paper money during its existence, and then in gold and silver, then it was a contract to pay in gold and silver after a certain period. The consequence is that as to the payments to be made after the period, the contract is not within the Act of Assembly, but as to those which were to be made before, it is.
But if this contract cannot be considered as a contract to pay part of the rents in paper money, and part in gold and silver, still the question will arise whether this Court has not power, under the fifth section of the Act of Assembly, to examine into the circumstances of the transaction, and make a rule of adjusting the rents, different from the scale of depreciation.
Upon this point, I consider the case of Watson v. Alexander, 1 Wash. 340, as decisive. The Court of Appeals in that case decided, that the fifth section was made as well for creditors as debtors. That the second section was intended to apply to contracts where no particular circumstances intervene; but where other circumstances do intervene, which would render the application of the rule unjust, whether to the creditor or the debtor, the Court under the fifth section have a right to award such judgment as to them shall appear just and equitable.
The next question, then, will be whether the circumstances of this case, render the application of the scale unjust. The annual rent, when reduced by the scale is only £1. 3s. 7±d. This cannot be a just rule, when lots of equal value rented, before the existence of paper money, for ten times, and after its abolition, at thirty times that sum in gold and silver. If, then, the application of that rule is unjust, what rule can this Court adopt more just and equitable ?
It is, in general, just and equitable that contracts fairly made, should be specifically executed, where a specific execution is possible, and will not be attended with circumstances of peculiar hardship. The contract in this case is to pay the rents annually in current money. This is admitted to be money current at the time when the rents become due. In the years 1780 and 1781, the rents might have been paid in the then current money, that is, paper, or gold and silver, at the option of the tenant. Payment in paper money has now become impossible; but the legislature has declared what shall be an equivalent for those years. Let the rents of those years, therefore, be scaled. But after those years, the option of the tenant ceased. Gold and silver became the only current money. It appears to have been the intention of the par *121 ties to pay in the current money of the time when the rents should become payable. It has now become possible to execute the contract specifically, and it appears to me that justice and equity require that it should be done, by paying the rents in the money which has been current ever since the year 1782.
Reversed by the Supreme Court of the United States. 2 Craneh, 10.