Hitchcock, C. J.
Although present in court during the argument of these cases, still, having been necessarily absent when the question of jurisdiction, the only question which seems to have been considered, was settled, I do not consider myself responsible for the decision made. With that decision, however, 1 have no disposition to complain. Had the judge delivering the opinion, satisfied himself with stating the point decided, and the reasons which induced the court to come to the conclusion at which it arrived, I should have remained silent. But since that judge has gone beyond this, and has expressed his individual opinion upon the main question involved in these cases, it seems to me to be an incumbent duty to examine that question, and to express my own views upon it.
*542 The question is simply this: whether the laws of the state authorizing the commissioners of a county, with the assent of a ^majority of the electors of the county, to subscribe stock to a railroad company, incorporated for the purpose of aiding in the construction of a railroad, which shall pass through the county, are constitutional. Every question of this character is of the first importance; as its solution may depend upon the exercise'of power by one department of the government over another. But in the present cases, it is of much more than ordinary importance. The railroads in the state which have been already constructed, have been in part constructed by the aid of city and county subscriptions. To secure the payment of this stock, so subscribed, bonds have been executed; and these bonds have been sold in the market, for the purpose of raising means to carry on the work. They are now in the hands of bona fide holders, who have received them, in part at least, upon the faith of the incorporated bodies by whom they were issued.
Other roads-are in the course of construction; and the means by which they are being constructed, have been derived from a similar source. To hold that the laws under which these bonds were executed, are unconstitutional, is to hold that the bonds themselves are’ void; and the bona fide holders will be compelled to lose the many millions which they have advanced 'upon them, In addition to this, if these laws are held to be unconstitutional, an entire stop will be put to works of this character. For many years to come railroad improvements must cease in this state. Not only so, but' if the judge is correct in his obiter dictum opinion, the roads already constructed may be destroyed. Notwithstanding all this, however, if those laws are unconstitutional, clearly so, the duty of the court is obvious—it must refuse to enforce them. But no court will, where such consequences are to result, act hastily, nor without the most serious deliberation.
The power of a court, in a proper case, to declare a legislative enactment unconstitutional, does not, at the present day, seem to bo seriously doubted. In this particular, a great change has come over the jmblie mind, since the adoption of constitutional forms of government in these United States; and especially *so in this state, since the adoption of our constitution of 1802. In the early history of this country, it will be seen that the right of judicial tribunals to exercise this power was strongly contested by some of *543 our most able men. In the front rank of these stood Mr. Jefferson, whose opinions have been more respected, by a portion of the community, than the opinions of any other man who has occupied a public station in the country. He uniformly denied the right of any court to decide upon the constitutionality of laws, and held, that in the exorcise of such power, a court was guilty of judicial usurpation. In his opinion, the power to correct irnconstitutional as well as injudicious legislation rested alone with-the people; and the power was to be exercised through the ballot-box.
Such was the opinion entertained by a majority of the public men of this state, at the time of, and soon after the adoption of our own constitution. The journals of the general assembly show, that one judge of the Supreme Court, and one president judge of the court of common pleas, were impeached for the exercise of this power. True, they were not found guilty by the high court of impeachment, the constitution requiring the concurring vote of two-thirds of the members of that court to convict; and in each case the vote was one less than this constitutional majority.
As before remarked, however, this power seems now very generally conceded to .the courts; and I can not well see how it could be otherwise. The constitution is the paramount law of the state. This instrument the judges of the court, as well as the other officers of the government, are sworn to maintain and defend. In it the powers of the several branches of the government are well defined. If the general assembly, in the exercise of its legislative power, transcend the limits prescribed for it, such an enactment is not a law, and no court can, consistently with the oath imposed upon its members, enforce it as law.
But although this power exists in the courts, it should be exercised with extreme caution. Before a court can be ^justified in disregarding a legislative enactment, on- the ground that it conflicts with the constitution, such conflict must be evident, clear, unmistakable. It must be in opposition both to the letter and spirit of the instrument. If, after full examination, any doubt exists, the enactment must be enforced. If error occurs in the determination of a question of this character, it is far better the error should be committed in sustaining the legislative enactment, than in refusing to enforce it. It is no light or trivial thing for a court to disregard a legislative act, on constitutional grounds. Such hitherto has been the principle by which the courts of the country have been. *544 governed; and when they shall depart from it, well may they be denominated, in the language of Mr. Jefferson, “sappers and miners of the constitution.”
At the February term of the Supreme Court of the United States, 1796, in the case of Hylton v. The United States, 3 Dallas, 171, a question was raised as to the constitutionality of a law of Congress of Juno 5, 1794, laying “ a tax on carriages for the conveyance of persons, kept for the use of the owner.” The court held the law to be constitutional. Judge Chase, in delivering his opinion, uses this language: “As I do not think the tax on carriages is a direct tax, it is unnecessary for me to determine, at this time, whether this court constitutionally possesses the power to declare an act of Congress void, on the ground of its being made contrary to, and in violation of the constitution; but if the court have such power, I am free to declare that 1 will never exercise it but in a very clear case.”
At the February term of the same court, 1800, in the case of Cooper v. Telfair, 4 Dallas, 14, the constitutionality of a law of Georgia was drawn in question. In commenting upon the subject, Justice Washington says: “ The presumption must always be in favor of the validity of laws, if the contrary is not clearly demonstrated."
In the same case, Justice Chase says: “It is indeed a *general opinion, it is expressly admitted by all this bar, and some of the judges have, individually, on the circuits, decided, that the Supreme Court can declare an act of Congress to be unconstitutional, and therefore invalid; but there is no adjudication of the Supreme Court itself upon this point.”
Up to this time it would seem that the Supreme Court had never exercised this power; but it was exercised in the celebrated case of Marbury v. Madison, 1 Cranch, 117. In this latter case, Chief Justice Marshall goes into a labored argument to prove that the court possesses the power ; and the law then under consideration was declared unconstitutional.
In the case of Fletcher v. Peck, 8 Cranch, 87, the same chief justice uses this language: “ The question whether the law be void for its repugnancy to the constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could *545 it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and laws should be such that the judge feels a clear and strong conviction of their incompatibility with each other.”
Such are the principles and rules of action by which the Supreme Court of the United States is controlled in deciding upon the constitutionality of laws; and in this particular there is no difference between that court and the courts of the several states. Thus, in Pennsylvania, it is hold that the courts can not interfere to set aside a law, unless the legislature have encroached on ground which they are positively or by necessary implication forbidden to enter. 11 Penn. St. 70.
In Kentucky it is held that if it be doubtful or questionable whether the legislative power has exceeded its limits, the judiciary can not interfere, though it may not be satisfied that the *act is constitutional. City of Louisville v. Hiatt, 2 Mon. 178.
In that case, the court hold the following language : “ And although we frankly admit that we have never been perfectly satisfied as to the constitutional validity of the power involved and considered in the case of the City of Lexington v. McQuillan’s Heirs, 9 Dana, 514; yet, still feeling as we did when we decided that case, that we are not able to perceive clearly, or to prove satisfactorily, that the legislature, in enacting section 11 of the charter of Lexington, transcended the boundaries of legislative power prescribed by the supreme organic law of the state—it does seem to us that we should be justly chargeable with wandering from the appropriate sphere of the judicial department, were we, by subtle elaboration of abstract principles, and metaphysical doubts and difficulties, to endeavor to show that such a power may be questionable, and on such unstable and unjudicial ground to defy and overrule the public will, as clearly announced by the legislative organ.”
In the case of Adams v. Howe, 14 Mass. 345, the court say: “We must premise that so much respect is due to any legislative aet, solemnly passed and admitted into the statute book, that a court of law which shall be called upon to decide its validity will presume it to be constitutional till the contrary clearly appears. So that, in any case substantially doubtful, the law would have its *546 force. The legislature is, in the first instance, to bo the judge of its own constitutional powers, and it is only when manifest assumption of authority, or misapprehension of it shall clearly appear, that the judicial power will refuse to execute it.”
The same court, in another case, hold this language: “ When called upon to ]3ronounce the invalidity of an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, courts will approach the subject with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new *light on the subject; and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.”
But it is unnecessary to cite additional cases upon this point. 'Whenever the question has been raised, the decisions have been uniform, so far as I have any knowledge. I am not the advocate of legislative supremacy, but would have every act tested by the constitution; and, in my opinion, every legislative act which conflicts with the constitution is void. But the legislative power of the state being vested in the general assembly, the acts of that body, when enacted in the forms prescribed by the constitution, are binding upon the peopile and courts of the state, until it can be shown that the same are in conflict with the constitution. It is not to be credited, as a general thing, that the legislative department of the government will transcend the limits prescribed for its action. It may do so through mistake—never by design. At least, it will not do so by design until it becomes corrupt. And if the day shall ever arrive when the legislative department of the government shall become corrupt, can we be sure that we shall have an uncorrupt court to check its action?
The laws claimed by the complainants in these cases to be unconstitutional are laws which authorize the commissioners of the two counties of Crawford and Wyandot to subscribe stock to a certain railroad company, for the purpose of aiding in the construction of a railroad through those counties. 'So far as the latter county is concerned, the subscription is not to be made until the question is submitted to the people, and the subscription advised by a majority of votes.
This law is no way different from many others in our statute-books, authorizing similar subscriptions, upon like terms. In order *547 to determine whether they conflict with the constitution, it is necessary that we should ascertain their nature, purport, and effect.
It is said that these laws are “void, for the reason that they are *in violation of the general, great, and essential principles of liberty and free government, recognized and forever unalterably established by the bill of rights.” And again it is said: “ To determine the extent of the legislative authority, under our constitution, we are not confined to the letter of the constitution, but we may properly look to its declared principles and objects; and a statute violating these is as clearly void as one violating the letter of the constitution.” This is not in accordance with the rule heretofore prescribed by the courts of the country for their action in deciding questions of constitutional law, although it may be in accordance with the dogmas of some modern theorists, who seem to have little regard for written constitutions, except as the same may comport with their ideas of right and justice. Lot this new rule be adopted, and the validity of a law would not so much depend upon the written constitution of the country as upon the opinion of the judges who should be called upon to decide upon its validity— whether it comported with the nature and fitness of things. In short, the constitutionality of the law would depend upon the opinion of the court whether or not it was expedient. Inexpediency would be as fatal to the validity of a law as unconstitutionality. It seems to me that the adoption of the principle contended for would strike at the foundation of all constitutional government.
The “ principles and objects ” of the constitution of Ohio are set forth in the preamble to that instrument as follows: “We, the people of the eastern division of the territory of the United States, etc., in order to establish justice, promote the welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish the following constitution or form of government; and do mutually agree with each other to form ourselves into a free and independent state, by the name of the State of Ohio.”
In section 1 of article 1 it is provided as follows: “ The legislative authority of this state shall be vested in a general assembly, which shall consist of a senate and house of representatives, both to be elected by the people.”
*To the legislative authority thus granted there is no restriction, except what is contained in the declaration of rights, which forms the eighth article of the instiurment. It is unnecessary to refer to *548 these restrictions, which are few; still, it is well enough for us to bear in mind the ninth section, which declares, “that no power of suspending laws shall be exercised, unless by the legislature.” To declare a law unconstitutional operates to suspend that law. Courts may err in giving construction to the constitution or to laws. The men who constitute the legal tribunals of the country are not infallible. And they should beware, lest, in attempting to correct the action of another branch of the government, by declaring that action inconsistent with the constitution, they themselves violate that instrument.
"What is the purport, tenor, and effect of these laws authorizing subscriptions of stock to railroad companies, by the commissioners of a county, by and with the assent of the people of the county ? From the first organization of the territorial government, counties have existed as distinct political divisions. By the constitution of the state, provision is made that the representation in the general assembly shall be apportioned among the several counties; that associate judges of the court of common pleas shall be elected in each county; and in’ establishing new counties the general assembly is restricted so far, that no new county can be established with less than certain territorial contents. On February 13, 1804, the general assembly enacted a law, “ establishing boards of county commissioners.” Chase’s Stat. 410. By this law provision is made for the election of three commissioners by the electors of each county, and the duties of these commissioners are prescribed. They are the managers of the prudential concerns of their respective counties, and are directed to “have a just and accurate record kept of their corporaieproceedings.” They are to assess county taxes and erect public buildings, in such manner as shall be prescribed by law; to liquidate all accounts, debts, and demands due from the county, and draw orders upon the county ^treasurer for the same, and such orders are receivable in payment for the county taxes. By an amendatory act of January 27., 1807 (Chase’s Stat. 560), they are authorized to recover, by suit, any claim duo the county, and are made capable of suing and being sued in any court of judicature within the state.
Since the enactment of the aforesaid laws, the constitutionality of which has never been questioned, the powers of county commissioners have, from time to time, been enlarged or diminished, as the interest of the counties seemed to demand. In some in *549 stances they have been authorized to purchase land for the use of the county; in others, to sell and convey land belonging to the county. In some instances they have been authorized to borrow money upon the credit of the county, and levy taxes sufficient to pay the interest on the same, and, finally, the principal. From the first organization of the board they have been the proper tribunal to decide upon, opening or vacating public highways, in their respective counties. Under peculiar circumstances, they may alter or vacate roads, laid out and established by the direct authority of the state. They are authorized to assess taxes for the erection of poor-houses ;• for the support of the poor; for the erection and repair of public buildings; for the opening and repairing of roads; for the erection of bridges; for the purposes of schools, and for county purposes generally.
The only effect of the laws now under consideration is to enlarge the powers of those boards of county commissioners. In addition to their other powers, they are authorized to subscribe stock to certain railroad companies for the purpose of constructing railroads through their respective counties. In the case of the Commissioners of Crawford County, the authority is absolute; in the case of the Commissioners' of Wyandot, it is dependent upon a previous vote of the electors of the county. And such is the provision of most, if not all, the other laws of the state authorizing similar subscriptions. And where the subscriptions are made, the commissioners are ^authorized, if it shall become necessary, to assess a tax to meet the interest, and eventually the principal. Such are the laws which are claimed to be unconstitutional.
Supposo, under the constitution of 1802, the general assembly should have enacted a law authorizing the commissioners of any one county in the state to construct a railroad or a turnpike road through the county—would such law have been unconstitutional ? Its enactment would have been an exercise of legislative pow.er; and all the legislative power of the state is vested in the general assembly, with very few restrictions. And certainly there is no express restriction to prevent the enactment of a law of this character. So far as the constitution is concerned, the general assembly have the same power to authorize commissioners of a county to construct a railroad that they have to authorize them to erect a poor-house or bridge, to construct a county road, or to assess a tax for the support of schools.
*550 ' Such law might be thought to be inexpedient or impolitic; but the inexpediency or impolicy of a law has nothing to do with its constitutionality. The question of expediency is a question for the law-making power, and the corrective for inexpedient legislation lies with the people. The question of constitutionality is also a question for the law-making power; but it may be reviewed by the courts. And if, upon such review, courts are governed by the rules heretofore recognized as being of vital importance, no danger is to be apprehended. It ought to be remarked, perhaps, that the corrective for unconstitutional legislation rests with the people more fully even than with the courts.
Now, if the general assembly possessed the power, under the constitution of 1802, to authorize the commissioners of a county to construct a railroad through their county, what is there in the same constitution to prohibit that body from enacting a law authorizing those same commissioners to subscribe stock in a company incorporated for the purpose of constructing *such road? I have examined the instrument with some care and I find nothing.
But it is said by counsel for complainants that, “when the constitution recognized counties it was as subdivisions of the state, with such local administrative capacities as have been given to them by immemorial usage, and nothing more.”
If this bo true, then all the laws of the state, which have conferred powers upon the counties, which they did not possess “by immemorial usage” at the adoption of the constitution, must be in conflict with that instrument. Where is the immemorial usage which will justify the general assembly in authorizing counties or county commissioners to borrow money, to purchase and convey land, to erect poor-houses, to assess taxes for the support of the poor, and for road and school purposes? It can not be found.
It is said further, that the powers of counties are local, and, therefore, “ they can not engage in building railroads, for railroads belong to the great commercial world.” All other roads, as much as railroads, belong to the commercial world, and the same arguments might be used against taxing the people of a county for the construction of a county road, as of a railroad passing through the county. A county road is not for the exclusive use of the people of the county. Others may pass over it for commercial or other purposes, as they deem proper. Still, the county is or may bo *551 taxed to keep the road in repair. It is true there is not the same absolute necessity for a railroad as for these county roads. ' But they are convenient for the people of the county as well as for others who may travel over them, and they have a direct tendency to enhance the value of the property of those residing in their vicinity; and by this enhancement of the value of property a county may be more than indemnified for its expenditures in contributing to their construction.
If, under the constitution of 1802, an act of the general assembly authorizing the county commissioners of a county to ^construct a railroad through said county, or authorizing them to subscribe stock in a company, incorporated for the construction of such road, would have been constitutional, is it rendered unconstitutional by attaching a condition thereto, that the authority shall not be exercised until the people, by a majority of votes, shall have assented to or approved of the making the road or of the subscription?
It is claimed by the counsel for complainants, that the law is rendered unconstitutional, because, as it is said, the law receives its force from this vote of the people, and that, in this voting, the people exercise legislative power. If it be so, the laws are unconstitutional ; for by the constitution, the legislative power of the state is vested in the general assembly.
It seems to me that counsel misapprehend the nature of these laws. The power to make a law is one thing; an authority or discretion to be exercised under a law is a different thing. The power to make the law is vested in the general assembly, but whether the law when made shall ever become effective, may depend upon circumstances. The general assembly exercises its legislative power in the enactment of a law incorporating a railroad or other company. The law is perfect in all its parts—but it does not become effective until it is accepted by the company, and an organization is perfected under it.
Suppose the laws under consideration had given the commissioners authority to subscribe or not at their discretion-—could it have been objected to, as unconstitutional, because it was not mandatory in its terms ? I think not. Now this, in substance, is the effect of these laws, with this difference—-the discretion, instead of being exercised by the commissioners of the county, is to be exercised by the people of the county. And it is proper that this discretion should be so exercised. The debt created, in consequence of the *552 subscription, is a debt against the county, and may have to be discharged by a tax upon the people of the county. In voting for or against a subscription, the people do not exercise legislative power. They do not make the law. *They act under, or in pursuance of, a law already made; and without the law, their action would be a nullity.
But it is said, by counsel for complainant, that the Court of Appeals of Delaware and the Supreme Court of Pennsylvania have declared such kind of legislation unconstitutional, and two cases are referred to as sustaining this dictum. The case decided by the court of errors and appeals in Delaware, is the case of Price v. Foster, decided in June, 1847. 4 Harrington, 479.
The circumstances of the case were these: There was a general law of the state in force, authorizing and regulating the granting of licenses to keepers of taverns and retailers of spirituous liquors. On February 19, 1847, the legislature of the state passed an act, entitled “ an act authorizing the people to decide, by ballot, whether the license to retail intoxicating liquors shall be permitted among them.”
The new act directed that on. the first Tuesday of April, 1847, the citizens of the several counties in the state should decide, by their votes, whether or not the retailing of intoxicating drinks should be permitted in. said counties; that if at the election there should be a majority for “ no license,” in any or all the counties of the state, it should not thereafter be lawful for any person to retail incoxicating liquors within such counties. It also contained a provision, that on the application of one-ninth of the legal voters of a county, to the levy court, the question of “ license ” or “ no license ” should again be submitted to the electors at the April election of any subsequent year, and if there should be a majority of votes for “ no license ” in any county, it should be an indictable misdemeanor to sell liquor in any such county, contrary to that act. But if, at said election, there should be a majority of votes for “license,” then the laws theretofore in force, regulating the licensing of taverns, etc., should remain and be in full force, as before, so far as respects such county or counties which should so determine. *At the April election next after the passage of the act, the people of New Castle county decided against license in that county, and the suit was brought to test the constitutionality of the law. The court decided that the law was not constitutional. They *553 rested their decision upon the principle that the law-making power •could not be delegated by the legislature, and that in this enactment an attempt was made to do this. They held, that the reference to the people to decide whether or not license should be granted; that according as they might decide in any county, the old law should continue in force, or be repealed or suspended in that county, and the new law take its place, a violation of which was to constitute an indictable offense; that the people of a county might, by their vote at subsequent elections from year to year, revive the old law and suspend the new one—were, taken altogether, a plain surrender to the people of the law-making power over this subject. They held that the laws in force when this act was passed were valid laws, and must remain in force until repealed by the legislative power.
In reference to this case, it is sufficient to say that the law then in question was entirely different from the laws of this state authorizing county subscriptions of stock in railroad companies. There was a general law of the state upon the subject of granting licenses to retail ardent spirits. This law was not expressly repealed by the act of 1847. By this latter act, however, the people of the several counties were authorized to suspend the operation of this law by their vote at one time, and in like manner at another restore it to vitality. The laws of this state, authorizing subscriptions, are conditional laws, or laws to take effect upon the happening of a contingency; and that contingency is, that a majority of the people of the county shall, by their vote, assent to, or advise the subscription.
It seems that in Delaware they have a law which provides that the school fund of the state shall be divided among the several school districts, and an equal proportion given to each, *on condition that the voters of such district raise by subscription or tax, each year, a sum equal to half of such district’s share of the school fund; but that no tax shall be levied unless, upon a vote by ballot, there should be a majority of votes for the tax. This law was pressed upon the consideration of the court, in the argument in favor of the law then immediately under consideration.
In commenting upon this argument, the judge delivering the opinion of the court says : “A law may be limited to expire at a certain period, or not go into operation until a future time, or the happening of a contingency, or some future event, or until some condi *554 tion be performed. Of this description are many of the laws of the general government respecting duties and imports, and laws of our state respecting corporations, which latter are not to operate until some condition be performed, or the assent of the corporation be given.”
This last example meets the case of these railroad subscrijrtions. The acts authorizing them are laws relative to corporations, enlarging their powers, and giving them rights or privileges not before possessed by them—the right of subscribing for stock on condition the corporators, the electors of the counties, assent; and these laws do not have any effective operation until this assent is obtained.
The same judge, in commenting on the school law, says : “ To say that the authority given to the school voters, the members of a corporation, to determine whether a tax shall be laid or not, is a grant of legislative power—is an abuse of language. Legislative power is the power of making laws. The making of a law prescribing by what persons or by what body, when and in what manner, taxes shall bo laid and collected, is the exercise of a legislative power. But the making of a resolution or order, or the determination or direction by the persons or body appointed for such purpose by the law, that taxes shall be laid and collected, is simply the execution of an authority granted by statute.”
*TJpon a full examination of this case of Rice v. Foster, and the argument of the court upon the subject, it seems to me that the decision goes to sustain rather than to militate against the constitutionality of the laws of Ohio now under consideration.
In 1847, the general assembly of Pennsylvania passed a law similar in its general features to the statute of Delaware, before referred to. A question upon the constitutionality of this law was raised in the Supreme Court of Pennsylvania, in the case of Parker v. The Commonwealth, 6 Barr, 507, and the Supi'emo Court held the law to be unconstitutional. This, however, was a majority decision, two of the five judges holding the law to be valid.
This case, which was decided in 1847, has since come under review on two several occasions in the same court. It was first reviewed the next year, in the case of the Commonwealth v. The Judges of the Court of Quarter Sessions, 8 Barr, 391. The case is as follows: A new township, called Washington, having been created out of the old township of Bethel, by commissioners appointed *555 by the court of quarter sessions of Lebanon county, the legislature, by an act of March 8, 1847, directed an election to be held within the townships of Bethel and Washington, by the qualified voters, in order to determine by ballot whether the new township should be continued or annulled. The question was to be determined by a majority of the votes polled. An election was accordingly held, and a majority of votes cast against the continuance of the new township. This result was duly returned and filed among the records of the court. On the part of the relator it was claimed this act was within the principle settled in the case of Parker v. The-Commonwealth, before referred to, and w,as, therefore, unconstitutional and void.
The court, however, held otherwise, and say, that “ this position-is founded in an entire misapprehension of the doctrine of that case; that the erection of a township or the creation of a new district, for mere municipal purposes or convenience in the transaction of public business, is in no degree similar *to the exercise of legislative power. The one is the exercise of sovereignty, the other in its very nature a subordinate function. The latter, like the laying out of a public road or highway, or the erection of a bridge, may require the exercise of judgment and skill, but there is nothing, either in the positive provisions of our constitution, or the genius of our institutions, which prohibits the actions of other than legislative bodies.”
After stating that the business of making new townships and dividing old ones had been, from early date, confided to the courts-of quarter sessions in the state, the court proceeds to say: “But, if the legislature can authorize the courts to decide questions of this character, they can also authorize the people primarily to do so. The difficulty is simply in the right to impart the power to act. If it can be given to a selected few, it may also be delegated ‘to all inhabitants of a district, unless positively prohibited.”
Let us apply this reasoning to the question now under consideration. By the general powers vested in county commissioners as a corptorate body, they were not authorized to subscribe to the stock of a railroad company. A contract of this description wa& not of the same character with those contracts which they were empowered to enter into. To increase or enhance the delegated authority so as to embrace contracts of this description, required the exercise of legislative power, and this power was exercised in *556 the enactment of the laws authorizing subscriptions to be made. By these laws they are made competent to enter into the contract. Whether this authority should be exercised, might depend upon the discretion of the commissioners, “the selected few,” or it ■might depend upon the discretion of the inhabitants of the county generally.
The case of Parker v. The Commonwealth came under review of tho same Supreme Court in the case of Commonwealth v. Painter •et al., 10 Barr, 214. The ease is stated thus: In April, 1847, the ■legislature of Pennsylvania passed an act providing that the qualified electors of the ..county of ^Delaware should determine by ballot, ■ at the next general election, whether the seat of justice should be continued as at present, or be removed to another place, and directing, in the event of there being a majority for the change, the commissioners should determine the exact location for the new public buildings, and proceed to erect them. The question •raised was as to the validity of this law, and the court hold it to be valid and constitutional.
I have already expressed the opinion that, under the constitution of 1802, the general assembly of Ohio possessed the legitimate power to authorize the commissioners of a county to construct a railroad in the county, or to subscribe stock to a company, incorporated for tho purpose of constructing such road, and that a law conferring such authority would not be rendered unconstitutional on account of a condition attached to it, that before the subscription was made, it should be approved of by a vote of tho people. I now propose to refer to a few decided cases in support of this opinion.
The first case I shall refer to is the case of the Commonwealth v. McWilliams, 11 Penn. St. 61.
This case is first referred to, not because it is first in point of time, but because it was decided by the same court which decided* Parker’s case, so strongly relied upon by counsel for complainants.
The case was this: In the year 1846, tho legislature of Pennsylvania passed a law authorizing the supervisors of the public highways in the townships through which the road of the Spruce Creek and Water Creek turnpike company might pass, to subscribe for, and in the name and behalf, and for tho use of the inhabitants of such township, any number of shares, not exceeding 3,800, on the ■capital stock of said turnpike road. Under this act the supervisors *557 of Franklin township subscribed for stock in the road, and laid a tax to pay for the subscription. The collection of the tax was resisted on the ground that the act was unconstitutional. The opinion of the court was delivered by the same judge who delivered it in the case of Parker v. The Commonwealth.
*He says: “ The act of 1834 empowers the supervisors of townships to assess and levy township taxes for the purpose of making and repairing roads and bridges, and for such other purposes as may be authorized by law. And the act of 1846, as we have seen, authorizes these supervisors to subscribe to the stock in question. The tax in controversy is therefore levied for a distinct purpose, authorized by law. But it is suggested that the latter act is unconstitutional. What provision of the constitution of Pennsylvania does it infract ? None has been pointed out, for none such exist.” This may be said of the cases now under consideration. No provision of the constitution of Ohio is pointed out by counsel as being violated. But the acts in question are said to be unconstitutional and void, “for the reason that they are in violation of the general, great, and essential principles of liberty and free government, recognized and forever unalterably established by the bill of rights.”
But the judge proceeds: “ Of late years, it has been much the fashion to impeach the action of legislative bodies as unconstitutional, where it happens not to accord with the party’s notion? of propriety and abstract right. This is very frequently done in sheer oblivion of the doctrine that express prohibition or necessary implication is necessary to oust the state legislature of authority. Where this prohibition is not found in the primordial law, the exertion of a power can not be deemed unconstitutional, even though it seem to trespass upon our ideas of natural justice and right reason.”
After commenting on the importance of roads, the court proceed to say: “ With us, accordingly, much attention has been bestowed upon them, and liberal powers for raising money by taxation vested in the officers charged with their superintendence. No one has yet dreamed of doubting the validity of that power, when applied to the maintenance of the ordinary roads of the country; and yet it is difficult to distinguish between these and a public turnpike road, so far as the advantage of the community is involved. The right, to exert the *power of taxation in support of the *558 latter, was considered at an early day in this state, in McClenagan v. Corwin, 3 Yeates, 362.”
Here was a law authorizing supervisors of the public highways in townships to subscribe stock to a turnpike company, and the validity of the law was sustained by the same Court which decided the case of Parker v. The Commonwealth.
But the court does not stop here. After citing from the opinion in the case reported in 3 Yeates, the judge proceeds as follows : “A very signal instance of the exercise of a similar power is afforded by the recent act of March 27, 1848, authorizing the city of Philadelphia, the county of Allegheny, the cities of Pittsburg and Allegheny, and the municipal corporations of the county of Philadelphia, to subscribe for shares of the capital stock of the Pennsylvania Bailroad Company, to borrow money to pay therefor, and to pay the principal and interest of the sum so borrowed. The exercise ■of this authority may, of course, entail additional taxation on the inhabitants of the several places designated. Yet, though before the enactment the right of a municij^al corporation to subscribe to the stock was strongly contested, no one has doubted it since; and, on the faith of this legislation, millions of dollars have been subscribed.”
Does the court express the least doubt of the validity of the legislation referred to in the last-quoted paragraph ? On the contrary, it is spoken of in terms of approbation. And no one reading this case can for a moment doubt that the Supreme Court of Pennsylvania would hold the laws of Ohio, authorizing counties to subscribe stock, to be valid and constitutional.
The next case I shall refer to is the case of Goodin v. Crump et al., 8 Leigh, 120.
The James Kiver and Kanawha Company was incorporated by the legislature of Yirginia, with power to unite the navigable waters of the James and the Ohio rivers, through the valley of the Groat Kanawha, by a canal or railroad. A majority of the citizens of the city of Bichmond, qualified by law to vote for members of the city council, petitioned the legislature to pass *a law authorizing a subscription by the city in the stock of the company. A minority objected to the law. An act, however, was passed, giving the authority asked for, and empowering the city authorities to lay taxes, etc., to meet the liabilities incurred by the subscription. The stock was taken, and a tax laid by the corporation to *559 pay the interest. Gooclin, one of the minority who had refused his assent to the law, filed his bill in chancery to enjoin the collection of the tax laid on his property, on the ground that it was an unconstitutional law.
The court, however, sustained the law, and dismissed the bill. The case shows that the court considered the law as an enlargement of the corporate powers of the city—as an amendment, in effect, of the city charter.
It was insisted by counsel for complainant 'in that case, as it is insisted by counsel in this case, that the legislature, from the nature of the thing, was limited to the object for which a municipal corporation or limited jurisdiction was created; that the corporation of Richmond being created for local objects, a power to tax a minority, against their consent, for a general object common to all the state, could not be conferred upon it. It was argued by them that the James and Kanawha river improvement was one in which the people of the whole state had an interest; and that the city of Richmond could no more be empowered to assess a tax on a dissenting minority for this purpose, from which the rest of the citizens of the state were exempt, than a like tax could be laid on them exclusively to pay the expenses of the legislature.
The court, in the first place, considered the question of the right of the legislature to confer new powers or privileges upon a corporation, on the consent of the majority against the will of the minority of the corporators. On this point they hold the following language: “ In this case it is contended that tbe legislature had no constitutional power to authorize the subscription by the corporation to the James River and Kanawha company. Tet it is admitted that the legislative has the power of incorporating a town with certain corporate powers, and it *ean not be denied that this power may be exercised without the unanimous consent of the inhabitants. It would 'annihilate the power, if the fiat of one man or ten men could arrest its exercise. Some number, then, less than the whole, must suffice to render valid the acceptance of the act of incorporation. And if a number less than the whole will suffice, who is to decide upon the plus or minus? Certainly not the judiciary; and as certainly it must fall within the legislative province. Bat the legislature has declared the assent of a majority sufficient. We must therefore take it that an original charter, accepted by a majority of the inhabitants, is valid; and pari *560 ratione, a charter giving new powers and privileges, at the instance of a majority, or accepted by them, is also valid.”
This shows that the assent or acceptance of the .corporators, whether express or implied, may be given by a municipal as well as a civil corporation. Nor is it material whether this assent be given before or after the enactment of the law.
The court further say: “ But it is said that corporate powers-must be confined to the limits of the corporation. This, I think, is a most imperfect test; for, confessedly, the limits of the corporation may be extended, so that, by this mode of reasoning, you extend the power by extending the boundaries of the city. Moreover, it is not denied that a corporation may bring water into the-city from a point beyond it, and it may erect its works for that purpose without its own jurisdiction. This affords us a better test. The interest of the corporation is the true test of the corporate character of the act; for every by-law, says Lord Holt, by which the benefit of the corporation is advanced, is good for that reason.
“ If, then, the tost of the corporate character of the act is the probable benefit of it to the community within the corporation, who is the proper judge whether a proposed measure is likely to-conduce to the public interest of the city ? Is it this court, whose avocations little fit it for such inquiries ? or is it the mass of the people themselves, the majority of the corporation, acting (as they must do if they act at all) under the sanction of the legislative body f The latter assuredly.
* “ The principles of good sense, not loss than those of our institutions, inculcate the propriety of leaving to individuals.and to communities the right to judge for themselves what their interest demands, instead of fettering and controlling, under the false notion that we, the governors, know what is good for them better than they themselves. Without, therefore, entering into the inquiry whether the subscription was for their benefit or not, I am of opinion that they were the proper judges, subject, nevertheless, to that control which necessarily exists in the charter-granting power.”
The opinion in this case certainly goes fully to sustain the validity of the laws of Ohio which are now brought in question. And there can be no doubt that the Court of Appeals of Yirginia, as well as the Supreme Court of Pennsylvania, would hold these laws to be constitutional.
In Yirginia they have a law in force, enacted in 1848, which *561 authorizes county subscriptions to railroad or turnpike corporations where the road to be constructed passes through or near by the county, provided a vote is first taken, and such subscription is assented to or advised by three-fifths of the persons voting.
The case of Bridgeport v. Housatonic Railroad, 15 Conn. 475, sustains the principles laid down in the two last cases referred to, and is a strong authority to sustain the constitutionality of the laws under consideration. It is unnecessary to quote from this case anything more than the syllabus :
“In May, 1836, a railroad company was incorporated, with power to construct a railroad from the northern line of the state to the city of Bridgeport. On March 2, 1837, the city of Bridgeport voted that it was expedient to aid in the construction of such railroad by subscribing one hundred thousand dollars to the capital stock of the company, and at the same time appointed an agent to make such subscription, and agents also to raise that sum, by procuring loans of money at an interest not exceeding six per cent, per annum, with power to pledge the credit of the city therefor by issuing its securities. The ^subscription was accordingly made on the books of the company, which was confirmed by the city on March 25th, when a further subscription of fifty thousand dollars was authorized, and the agents directed, as before, to raise the requisite sums. At the same time, the city voted that a petition should be presented to the legislature for the passage of an act validating its former proceedings on this subject, and praying that such further powers might be conferred on the city as should be necessary to carry these proceedings into effect. Such a petition being presented, the legislature, in 1838, granted the prayer thereof, and ratified, confirmed, established, and made obligatory on said city, and the citizens thereof, all their former proceedings in the same manner and to the same extent as if all the necessary powers for that purpose had been conferred by the charter of the city; and also empowered the city, at any legal meeting called for that purpose, to adopt such other measures as, in their opinion, might be necessary to carry into effect all the former proceedings; and to provide for the negotiation and payment of the subscriptions, loans, and securities, and providing that the securities which had been, or might be issued, should be obligatory on the city, to all intents and purposes, and might be enforced and collected in the same manner and to the same extent that debts lawfully con *562 tracted by towns in this state are enforced under tbe existing laws. This legislative act, in conformity with a proviso contained in it, was afterward duly accepted and approved by the freemen of the city.
“ In an action of debt on one of tbe bonds of tbe city, executed by its agents, duly appointed and empowered, under tbe seal of tbe corporation, and issued for stock in tbe railroad company, to recover interest, payable semi-annually, wbicb bad become due, it was beld:
“ 1. That tbe legislative act of 1838 (aside from any unconstitutional infirmity) gave validity to tbe previous proceedings of tbe city and its agents, whether they were otherwise valid or not.
“ 2. That such act was not inoperative, as being reactive, unjust, or unconstitutional.
*“3. That tbe city was thereby empowered to issue its bonds for stock in tbe railroad company.
“ 4. That tbe bonds were not rendered invalid, because they were issued in full of the subscription, while tbe stock was payable by future installments, nor because tbe interest was payable semiannually.”
Tbe case of Talbot v. Dent, 9 B. Mon. 526, is a case in point. Tbe action was replevin to try tbe validity of a tax.
The question raised was as to tbe validity of a law of tbe State of Kentucky, wbicb authorized tbe mayor and council of tbe city of Louisville, with tbe consent and approbation of a majority of tbe qualified voters of said city, expressed by a vote at a regular election of city officers, and upon a regular submission of tbe question, after due notice, to subscribe for stock, not exceeding a prescribed amount, in the Louisville and Frankfort Bailroad Company; such stock to be paid for by tax upon tbe property subject to city taxation.
Tbe court beld tbe act to be valid and constitutional; and beld, further, that taxation, by a local corporation, for a local purpose, and tending to promote tbe local prosperity, is within tbe scope of corporate powers of city corporations, when sanctioned by legislative authority, though not consented to by each individual.
The case of Chesney v. Hooser, 9 B. Mon. 250, was an action of trespass to try tbe validity of a corporation tax, and decided, like tbe last case, by tbe Court of Appeals of Kentucky.
In this case tbe court beld:
*563 1. The legislature have the constitutional power to confer taxing power upon local corporations for their government and security'.
2. All the lands of the commonwealth are held subject to tho general powers of the legislature to tax them, either for general purposes of government, or for local purposes, within localities in which they may be situated.
*3. When a town stands in noed of a local government, the legislature may not only provide such government, but may constitutionally give powers to its local authorities to tax the property and citizens"within its limits for the support of such government.
The case of Nicol v. Mayor and Aldermen of Nashville, 9 Humph. 252, was a case in which the constitutionality of a law of Tennessee, authorizing the city of Nashville to subscribe stock to a railroad company, was drawn in question, and the court sustained the constitutionality of the law.
It is unnecessary to refer to further cases. Those already cited go clearly to sustain the constitutionality of the laws of this state; and if decided cases are to have any influence, these are sufficient.
Counsel for complainants, however, say that these cases relate to subscriptions made in pursuance of corporate powers, confined to. cities, and claim that the distinction between the legal powers of cities and those of counties and townships are clear and unmistakable. In the case cited from Pennsylvania, the subscrijDtion was made by the supervisors of a township. It was not a city, but a township subscription.
It is true there is a manifest distinction between tho legal powers of cities and counties or townships. But whence arises the distinction? Clearly from their acts of incorporation. In neither city nor county is there any natural ^.inherent power. The power which either possesses is power delegated by the supreme power of the state. And if it be within tho constitutional power of the general assembly to authorize an incorporated city to subscribo stock to a railroad or canal company, it is equally competent to confer the same authority upon a county, although the corporate powers of the latter are in many respects different from those of the former. If the termination of a railroad at or near a city will conduce to the prosperity of the inhabitants of that city, may not the same railroad conduce to the prosperity of the inhabitants of the counties through which it shall be constructed? This is a question that can as *well be determined by the inhabitants *564 of a county as by those of a city. At least I should be unwilling to say that the latter wore any more competent to determine upon their own interests than were the former. And I believe either are more competent to determine this question for themselves than this court.is to determine it for them.
Although counsel for complainants have not pointed out the particular part of the constitution which is violated by the laws now under consideration, the judge delivering the opinion of the court, in his obiter dictum, expresses the opinion that this description of legislation is “not only a violation of the essential principles of liberty and free government, but in direct derogation of section 4, in article 8, of the late constitution of Ohio.”
This section 4 is as follows: “Private property ought and shall ever bo held inviolate, but always subservient to the public welfare, provided a compensation in money be made to the owner.”
If I understand the opinion of the judge, he supposes this section is violated by these laws, because the county commissioners, having made the subscriptions authorized, are empowered, if it shall become necessary, to assess taxes upon the taxable property of the county, to meet the interest and eventually pay the jjrincipal of the sum subscribed. I have never supposed that this section had any reference whatever to the power of taxation. If to levy and collect taxes is to take private property for public use within the moaning of this section, no person can be compelled to pay a tax until he has first received a “ compensation in money.” If the principle be sound, it must apply to taxes of every description—to taxes for state, as well as for county, school, and corporation purposes. There is a difference between the simpler power of taxation and the power of taking private property for public use. This section of the constitution relates to the latter—to a case where the property is taken; as, for instance, land for the purpose of a public road, or the materials for its construction. These can not be taken until compensation *is made; but when the road is once established, a tax may be exacted of the community generally, to keep it in repair. If it be not so, then all our laws levying taxes for road purposes are unconstitutional.
It seems to me that the case of Thomas v. Leland et al., 24 Wend. 65, is fatal to this objection. The facts relative to the case were, that some time previous to 1834, the canal commissioners had fixed on Whitesboro as the termination of the Chenango canal, thinking *565 tbat its connection with the Western canal could be more economically made at that point than at Utica. March 24, 1834, a law was passed authorizing a change, so that the termination should be at Utica; provided, those more immediately interested should defray the extraordinary expense. Hereupon, several individuals bound themselves to pay this extraordinary expense. Afterward the legislature of the State, deeming the debt thus contracted to be partial and onerous, and believing the termination at Utica would be beneficial to that place, passed an act in 1835, the object of which was to levy a tax on the owners of real estate in Utica, to pay this additional expense.
The constitutionality of this law was drawn in question, and one objection was that it was seeking to take private property for public use without compensation. In commenting upon the argument of counsel, Judge Cowen, in delivering the opinion of the court, proceeds as follows:
“But, it is said, that if the act had in view the construction of the canal, then it was unconstitutional, as seeking to take private property for public use without just compensation, or any compensation. To sustain this argument, it must be denied that the general profit of the community to which we belong will warrant a tax affecting our property. One answer in the case at bar is, that the improvement in question was, in itself, a compensation to the plaintiff. Such, at any rate, was the theory of the proceeding, apd we must intend it was carried out in practice. Such was the view taken by the legislature, and they must bo left to judge of the compensation.
*“ But the argument proves quite too much. It would go to cut off entirely many acknowledged powers of taxation—-such as that which raises money to relieve the poor, or establish and keep on foot common schools, to build bridges, or work the highways. It confounds two distinct legislative powers: a simple power of taxation, with the power of taking private property for public use. Th,e former acts upon communities, and may be exerted in favor of any object which the legislature shall deem for the public benefit. A tax to build a lunatic asylum may be mentioned as one instance. If the power to impose such a tax were to be rested on the ground of individual pecuniary benefit to each one who should be called on to contribute, it is quite obvious it would not be maintained for a moment. Yet who would doubt that such might be imposed on a local community, a county, or even a town?”
*566 It seems to me that the distinction between taking private property for “public use,” or “ the public welfare,” and the levying and collecting of taxes, is too obvious to require further comment, and I can not think that the before-recited section of article 8 of the constitution has any application to the cases now under consideration.
But this section is important, taken in connection with another statement of the judge, in his opinion before referred to. In speaking of railroads and their utility, he says: “-But because they accommodate individuals, and advance the public interest, it will not do to say that they are such a public use, that private property may be taken without the consent of the owner to construct them.” I do not know that I fully understand what is' intended by this declaration. If the intention is that a railroad corporation is of that character that it can not acquire the right of way over a man’s land without the assent of the owner, it is at war with the entire legislation of this state, and of every other state in the Union which has legislated upon the subject. And if any such -doctrine is sustained, it will not only prevent the construction of any further railroads in the state, but will lead to the destruction of those already constructed. This right of way can not be acquired ^without making compensation. But railroads have heretofore, in the legislation of this state, been so far considered “ a public use,” or, in the words of the constitution, for the “ public welfare,” that the corporation has been authorized to acquire the right of way by 11 making compensation,” even against the assent ■of the owner of the land. In this respect the legislation of other states in the Union has been similar to our own. Railroads have been considered, in this particular, as much a “ public use,” as have been public highways. I am unwilling to believe that the judge intended to intimate a doubt as to the constitutionality of this course of legislation.
But the judge says that this description of legislation is in “violation of the essential principles of liberty and free government;” and such is the position assumed by the counsel for complainant. Is it so ? And if it bo so, does it furnish any good reason to declare the legislation invalid ? If all men would definitely agree upon what constituted the “ essential principles of liberty and free government,” it might do to test the validity of a law by these principles. But herein consists the difficulty. Upon this subject *567 there is great contrariety of opinion. A.nd if this were adopted as a test of the validity of laws, legislative enactments would or would not be enforced according to the opinions of the judges before whom they might come in review, as to what constituted the “ principles of liberty and free government.” The same enactment would be held invalid by one set of judges, which would be enforced by another. There is now great complaint of the uncertainty of the law; but by the adoption of this test, that which now, to a certain extent, is uncertain, would be rendered tenfold more so. ¥e have in Ohio a class of enthusiasts who hold all laws to be inconsistent with the “principles of liberty,” and deny entirely the power of human government. They hold that each man’s actions must be controlled by the dictates of bis own conscience ; and so long as he acts accordingly, it is usurpation to attempt to make him amenable to any human tribunal. The number of this class, it is true, is small, and it can not be expected they will ever make much difficulty in the state.
*By the constitution of the state, I have ever supposed that the “principles of liberty and free government” were well established. And to my mind, it is clear that “'liberty and free government can not exist without laws. And just so far as the laws are sustained, so far the liberties of the people will be sustained. From the community of the entire state down to the communities of school districts, the principle prevails that the will of the majority must control. In the election of officers, a plurality even controls. By the vote of a majority, vast sums have been expended by the state in works of internal improvement. This has ever been opposed by a minority. Still the tax operates alike upon all. Is this opposed to the “ principles of liberty and free government?” By the vote of a majority in a township, a townhouse can be erected. Can those who vote in a minority be exempt from the expense ?
By the vote of the majority of a school district, a tax can be levied for the support of schools in the district, and this tax must be paid as well by the minority as the majority. Is this unjust, and in violation of “the principles of liberty?” If a majority of the people of a county think it advantageous to their county to have a railroad constructed through the same, and vote accordingly, can the minority with any greater propriety complain that they are taxed with the majority to defray the expense, than in *568 the cases before referred to ? If the improvement is beneficial to the county, they partake of that benefit equally with the majority, and in justice are equally bound to contribute to the exjjense.
I have said much more upon the questions involved in these cases than I intended. They are highly important, and after the most mature deliberation and reflection, I can come to no other conclusion than that the legislation drawn in question is in accordance with the constitution of the state. It is nowhere prohibited in that instrument, and is fully within the scope of the legislative power vested in the general assembly.